**ASSOCIATION OF AMERICAN RAILROADS, American Short Line Railroad Association, and Regional Railroads of America, Petitioners,**

v.

**SURFACE TRANSPORTATION BOARD and United States of America, Respondents.**

Transportation Trades Department,
AFL–CIO, Intervenor

Nos. 97–1624, 97–1650 and 97–1653

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 1, 1998.

Decided Nov. 17, 1998.

Jo A. DeRoche argued the cause for petitioners. With her on the briefs were Alice C. Saylor and Kenneth P. Kolson.

Louis Mackall, V, Attorney, Surface Transportation Board, argued the cause for respondents. With him on the joint brief were Joel I. Klein, Assistant Attorney General, United States Department of Justice, John J. Powers, III, and Robert J. Wiggers, Attorneys; and Henri F. Rush, General Counsel, Surface Transportation Board.

Lawrence I. Willis was on the brief for intervenor Transportation Trades Department, AFL–CIO.

Before: WALD, SENTELLE and TATEL, Circuit Judges.

SENTELLE, Circuit Judge:

The Association of American Railroads ("AAR") petitions for review of a Surface Transportation Board ("STB" or "Board") decision amending its regulations governing exemptions from certification procedures for certain small rail line purchases. Under the new rule, to qualify for the exemption railroads that will have a post-acquisition net worth of more than $5 million must give employees on the acquired rail line 60 days notice of their "general intentions in hiring a work force" and basic information on compensation and employee qualification requirements. Petitioners argue, *inter alia*, that the 60–day notice requirement is a "labor protection condition[ ]" which the STB is barred by 49 U.S.C. §§ 10901 and 10902 from requiring, and challenge the choice of a $5 million threshold as arbitrary and capricious. The STB responds that the 60–day notice requirement is not labor protection, and that it properly promulgated this rule under 49 U.S.C. § 10502, which grants the Board authority to permit exceptions to its existing rules. For the reasons stated below, we uphold the 60–day notice requirement as within the Board's power under 49 U.S.C.

§ 10502 to tailor exemptions from its regulations, and hold that the STB's choice of a $5 million limit was not arbitrary and capricious.

## I. Background

The STB regulates the sale and transfer of rail lines under 49 U.S.C. § 10901, governing construction and operation of railroad lines, and 49 U.S.C. § 10902, governing short-line purchases by Class II and Class III rail carriers. To construct or operate a rail line, or to acquire or operate extended or additional rail lines, a party must obtain from the STB a certificate authorizing that activity. *See* 49 U.S.C. §§ 10901(a), 10902(a). Sections 10901 and 10902 both contain the following provision:

> (c) The Board shall issue a certificate authorizing activities for which such authority is requested in an application . . . unless the Board finds that such activities are inconsistent with the public convenience and necessity. Such certificate may approve the application as filed, or with modifications, and may require compliance with conditions (other than labor protection conditions) the Board finds necessary in the public interest.

49 U.S.C. §§ 10901(c), 10902(c). The Board has promulgated regulations governing the content of these certificate applications and created procedures for filing and publishing them. *See generally* Certificate to Construct, Acquire, or Operate Railroad Lines, 49 C.F.R. pt. 1150. The Board also may grant exemptions from regulations promulgated under Sections 10901 and 10902 under 49 U.S.C. § 10502, which permits the STB to create expedited review processes. Absent a grant of exemption under Section 10502, normal procedures result in at least 70 days of advance notice before line acquisitions are approved. Even without allowing for normal administrative delays, the rules allow 35 days for the public to file oppositions after publication of an application, 49 C.F.R. § 1150.10(g), five days for applicants to reply, 49 C.F.R. § 1150.10(h), and "typically an additional 30 days for the Board's decision to become effective after it is issued." Respondents' Brief at 10. Inherent in this scheme then, is a 70–day window between the first publica-

tion required under the rules and the effective date of the transaction. It is against this framework that we evaluate the Board's amendment to the exemption.

The governing provision, Section 10502, provides in relevant part:

(a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Board under this part, the Board, to the maximum extent consistent with this part, shall exempt a person, class of persons, or a transaction or service whenever the Board finds that the application in whole or in part of a provision of this part—

(1) is not necessary to carry out the transportation policy of section 10101 of this title; and

(2) either—

(A) the transaction or service is of limited scope; or

(B) the application in whole or in part of the provision is not needed to protect shippers from the abuse of market power.

. . .

(d) The Board may revoke an exemption, to the extent it specifies, when it finds that application in whole or in part of a provision of this part to the person, class, or transportation is necessary to carry out the transportation policy of section 10101 of this title. . . .

. . .

(g) The Board may not exercise its authority under this section to relieve a rail carrier of its obligation to protect the interests of employees as required by this part.

49 U.S.C. § 10502. The new rule implements Congress's requirement that exceptions be permitted when they are in keeping with the goals of the overall regulatory scheme. The exemptions granted under Section 10502 allow railroads to avoid sometimes cumbersome regulatory procedures when making small purchases. The Board first created an expedited review system in 1985 in *Ex Parte No. 392 (Sub–No. 1), Class Exemption for the Acquisition and Operation of Rail Lines Under 49 U.S.C. 10901*, 1 I.C.C.2d 810 (1985). Under the original expedited review system created by the Board, sales could go through in either 7 or 21 days, depending on the type of transaction. In a decision effective July 24, 1996, the STB adopted a similar exemption for the acquisition or operation of rail lines by Class III railroads. *Class Exemption for Acquisition or Operation of Rail Lines by Class III Rail Carriers Under 49 U.S.C. 10902*, 1 S.T.B. 95 (1996). With publication delays, the public and employees might receive their first notice of the expedited transaction after the sale went through. The Board decided that the uncertainty that resulted from the lack of notice might have detrimental effects on employees and in many cases could slow, rather than expedite, the processes because community and employee interests might oppose the sale due to a lack of information. *See Acquisition of Rail Lines Under 19 U.S.C. 10901 and 10902—Advance Notice of Proposed Transactions, STB Ex Parte No. 562*, slip op. at 4 (Sept. 2, 1997).

In an effort to alleviate this problem, the Board commenced the rulemaking at issue here. The final order amends various portions of the code of federal regulations, and provides that in order to qualify for exemption under the new rule, the buyer of the rail lines must provide "general notice of [its] intentions in hiring a work force," telling employees of the acquired railroad "in general terms, the types and numbers of jobs expected to be available, the terms of employment and the principles of selection." *Ex Parte No. 562*, slip op. at 5–6. Notices are to be posted at the workplace and mailed to the national offices of the labor unions of the employees. *See id.* The STB adopted this new rule in September 1997 after notice and comment rulemaking.[1] The Board justi-

---

1. The final order amended 49 C.F.R. §§ 1121.4, 1150.32, 1150.35, 1150.42 and 1150.45. Section 1121.4 was amended to include the following paragraph:

(h) In transactions for the acquisition or operation of rail lines by Class II rail carriers under 49 U.S.C. 10902, the exemption may not become effective until 60 days after applicant certifies to the Board that it has posted at the

fied the rule by stating that information would help employees make important career choices, such as whether they would continue to work for their current employer, transfer to the acquiring company, or seek work elsewhere. Greater employee knowledge would help keep the rail industry efficient, and would prevent groups from opposing these expedited transactions. *See id.* at 7–8. The Board also stated that it would consider requests for exemptions from the 60–day notice requirement at the appropriate time. *See id.* at 7.

## II. Discussion

AAR and associated parties oppose the new rule, and petition for review under 28 U.S.C. §§ 2321, 2342 and 2344. They argue that the STB has no authority under its statutes to promulgate the rule, contending that the 60–day notice is "labor protection," which the STB is forbidden explicitly to impose on transactions governed by Sections 10901 and 10902—rail-line acquisitions by Class II rail carriers, Class III rail carriers, and noncarriers. Section 10901(c) and Section 10902(c) authorize the STB to "require compliance with conditions (other than labor

protection conditions) the Board finds necessary in the public interest." 49 U.S.C. §§ 10901(c), 10902(c). Creating the 60–day notice requirement, AAR argues, does not exempt railroads from regulation under Section 10502, but illegally creates new regulations. They also argue that the Worker Adjustment and Retraining Act. ("WARN Act"), 29 U.S.C. §§ 2101–2109, determines which railroads should be required to provide notice and that the STB rulemaking violates the mandates of WARN. Finally, they argue that there was no justification for the $5 million threshold for notice, and that in certain cases its application would lead to absurd results. During the notice and comment period they urged the STB to adopt thresholds from other statutes, and now argue that its failure to do so was arbitrary and capricious. We consider each of these arguments in turn.

### A. Exemption under Section 10502

■ AAR argues that the STB exceeded its authority in relying on Section 10502 when it added the 60–day notice requirement. Section 10502 authorizes the Board to

---

workplace of the employees on the affected line(s) and served a notice of the transaction on the national offices of the labor unions with employees on the affected line(s), setting forth the types and numbers of jobs expected to be available, the terms of employment and principles of employee selection, and the lines that are to be transferred.

*Ex Parte No. 562*, slip op. at 9. Section 1150.32 was amended to include the following paragraph:

(e) If the projected annual revenue of the carrier to be created by a transaction under this exemption exceeds $5 million, applicant must, at least 60 days before the exemption becomes effective, post a notice of intent to undertake the proposed transaction at the workplace of the employees on the affected line(s) and serve a copy of the notice on the national offices of the labor unions with employees on the affected line(s), setting forth the types and numbers of jobs expected to be available, the terms of employment and principles of employee selection, and the lines that are to be transferred, and certify to the Board that it has done so.

*Id.* Paragraph (a) of Section 1150.35 was amended to read as follows:

(a) to qualify for this exemption, applicant must serve a notice of intent to file a notice of exemption no later than 14 days before the

notice of exemption is filed with the Board, and applicant must comply with the notice requirement of § 1150.32(e).

*Id.* Section 1150.42 was amended to include the following paragraph:

(e) If the projected annual revenue of the rail lines to be acquired or operated, together with the acquiring carrier's projected annual revenue, exceeds $5 million, the applicant must, at least 60 days before the exemption becomes effective, post a notice of applicant's intent to undertake the proposed transaction at the workplace of the employees on the affected line(s) and serve a copy of the notice on the national offices of the labor unions with employees on the affected line(s), setting forth the types and numbers of jobs expected to be available, the terms of employment and principles of employee selection, and the lines that are to be transferred, and certify to the Board that it has done so.

*Id.* at 10. Paragraph (a) of Section 1150.45 was amended to read as follows:

(a) to qualify for this exemption, applicant must serve a notice of intent to file a notice of exemption no later than 14 days before the notice of exemption is filed with the Board, and applicant must comply with the notice requirement of § 1150.42(e).

*Id.*

deregulate as necessary, not to regulate. Therefore, imposing an additional requirement as a condition of granting the exemption is impermissible. We have held that discretionary power to deregulate "does not authorize the utilization of [ ] deregulatory powers as a means to achieve a new regulatory format." *Brae Corp. v. United States,* 740 F.2d 1023, 1059 (D.C.Cir.1984). In *Brae,* we reviewed regulations promulgated by the ICC creating a new rate structure governing a railroad's use of boxcars owned by another carrier. The new regulations, among other things, set new car hire and storage rates, and allocated costs for the movement of empty boxcars. The Commission attempted to justify its new rules as "a partial exemption from regulation subject to conditions." *Id.* at 1036. We held that the ICC exceeded its authority under the deregulation provisions of 49 U.S.C. § 10505(a) when it imposed the new rate structure because Section 10505(a) permitted it only to *deregulate. Id.* at 1055. To hold otherwise, we said,

> would give the Commission carte blanche to rewrite the Interstate Commerce Act under the umbrella of its exemption powers. That is, the Commission could invoke section 10505(a) as the authority both for exempting a section and for then re-regulating the industry under a completely different format. This would clearly exceed the powers granted to the Commission under section 10505(a).

*Id.* AAR argues that, as in *Brae,* here the STB is promulgating new regulations in the guise of deregulation, which it may not do.

■ We disagree. The STB makes the changes we consider here under its power to deregulate under Section 10502. Inherent within the power to create exemptions from the regulatory scheme is the power to limit the scope of those exemptions. We agree that the STB may not create new regulations in the guise of deregulation. However, it may, consistent with Section 10502, amend its original scheme of deregulation if it finds that the transportation policies so require. *See, e.g., Illinois Commerce Commission v. ICC,* 787 F.2d 616, 632–33 (D.C.Cir.1986) (discussing with approval reconsidering and

then restricting the scope of an initial grant of eligibility for exemption).

The standard of review for the Board's interpretation of its authority is supplied by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

> Under the *Chevron* doctrine, a court reviewing an agency's interpretation of a statute it administers must first determine whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, the review ends there for the court must give effect to the unambiguously expressed intent of Congress. If the court determines that Congress has not directly addressed the precise issue, however, it then goes to the second step of the review to determine whether the agency's interpretation is based on a permissible construction of the statute. In this second step, the court must accord considerable weight to the agency's construction of the statute and it may not substitute its own construction of the statute for the agency's reasonable interpretation.

*American Petroleum Inst. v. EPA,* 52 F.3d 1113, 1117–18 (D.C.Cir.1995) (citing *Chevron,* 467 U.S. at 843–44, 104 S.Ct. 2778) (citations omitted).

We do not find in Section 10502 a clear expression of congressional intent to create a one-way ratchet, permitting deregulation only, without subsequent adjustment. In fact, we conclude that significant discretion has been granted to the agency to determine how much deregulation is appropriate under Section 10502. *Cf. Coal Exporters Ass'n of U.S. v. United States,* 745 F.2d 76, 82 (D.C.Cir.1984) (interpreting predecessor provision). Applying the deferential standards required by *Chevron* step two, we conclude that the STB's interpretation of its authority is not unreasonable, and decline to substitute our judgment for the Board's.

In examining the predecessor to the provision at issue here, governing deregulation by the Interstate Commerce Commission, we held that the agency's "argument that it is empowered to adopt either partial or complete exemptions from regulations is clearly correct." *Brae,* 740 F.2d at 1054. We also

recognized that deregulation meant the removal, not the imposition of a new regulatory scheme. *See id.* However, here we do not find the imposition of a new regulatory scheme, but rather the limitation of the scope of an exemption from the preexisting regulatory scheme.

As discussed above, the regulatory scheme, absent exemption, has 70 days of advance notice built into its structure. The Board has now determined that the class exemption rules it previously adopted cut the normal time for acquisition to 7 or 21 days. This created problems among rail employees and the public because of the short notice. The administrative procedure for reintroducing notice while maintaining the exemptions merely restores a portion of the normal notice requirement. It does not create additional regulations. The problems that we found in *Brae* are not present here. In *Brae*, the ICC was scrapping a rate schedule created by Congress and substituting one of its own, calling it deregulation. The new regulation requires the same party to provide less notice than it otherwise would, and to provide less detailed information than it otherwise would. The Board is not barred from revisiting its decisions in light of its experience. We therefore hold that promulgating exemption procedures which call for less notice than the norm does not amount to impermissible regulation. Should the railroads desire, they are free to revert to the normal procedures under Sections 10901 and 10902.

### B. *Labor Protection*

■ We now turn to AAR's argument that the notice requirement is "labor protection" which the Board is banned from imposing by the plain language of the statute. Under both Sections 10901(c) and 10902(c) the Board "may require compliance with conditions (other than labor protection conditions) the Board finds necessary in the public interest" when determining whether it will issue a certificate to the railroad seeking to take action. AAR argues that because the 60–day notice is a labor protection condition within the meaning of the statute, the Board is barred from requiring notice.

The Board does not suggest, and we do not hold, that it may impose in the guise of a condition on deregulation a provision that it could not impose *ab initio* under Sections 10901 and 10902. We therefore examine the 60–day notice provision to see if it is within the prohibited category of "labor protection conditions."

Under the Supreme Court's guidance in *Chevron*, significant leeway is granted to the agency's interpretation, absent a finding that "Congress has directly spoken to the precise question at issue." *American Petroleum Inst.*, 52 F.3d at 1117. At the first step of the *Chevron* inquiry, we examine the term "labor protection." Congress has not defined the term "labor protection" in its statute. Nor is there a plain meaning of the term. Instead it must be examined in context. "Labor protection" is a recognized term of art in the railroad industry. *See New York Dock Ry. v. U.S.* 609 F.2d 83, 86 (2d Cir. 1979) (providing "a brief outline of the history of railway labor protective conditions relevant to consolidations, mergers, acquisitions and other similar transactions"). The term "labor protection" encompasses a panoply of provisions acting together, including wage protection, severance pay, protection of benefits and relocation expenses, as well as advance notice of pending actions and dispute resolution. *See id.* at 86–87.

Given the importance of context to the definition of the term, we cannot say that Congress has spoken directly to the precise issue here; *i.e.*, whether the 60–day notice provision standing alone falls within the prohibited category. We therefore proceed to the second step of the *Chevron* inquiry, in which we "accord considerable weight to the agency's construction of the statute," *American Petroleum Inst.*, 52 F.3d at 1117, and "may not substitute [our] own construction of the statute for the agency's reasonable interpretation." *Id.* at 1117–18. The Board explicitly stated that the 60–day notice provision was not labor protection. *See Ex Parte No. 562*, slip op. at 5. The notice serves a different purpose than the notice at issue in *New York Dock*:

> Unlike the situation where we impose labor protective conditions, buyers are not

required to hire any of the seller's employees, nor are they required to protect their pay with displacement allowances, or to make payments to employees they do not hire.

. . . .

. . . The notice requirement we are imposing here is informational, and it does not trigger any other legal obligations.

*Id.*[2] While it is obvious that there is a quantum of conditions which, if enacted together, would fail even the deferential *Chevron* standard, we hold that the 60–day notice provision by itself does not cross that line. We therefore uphold the Board's reasonable interpretation of its statute.

### C. *The WARN Act*

■ Next we turn to the argument that the WARN Act precludes the Board from adopting the 60–day notice requirement. AAR argues that the WARN Act sets thresholds that govern when employers selling all or part of their businesses must provide advance notice:

> An employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order . . . to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee. . . .

29 U.S.C. § 2102(a). The WARN Act also provides: "In the case of a sale of all or part of an employer's business, the seller shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 2102 of this title, up to and including the effective date of the sale." 29 U.S.C. § 2101(b)(1). An "employer" is a business enterprise that has 100 or more employees. 29 U.S.C. § 2101(a)(1). A "plant closing" is a permanent or temporary shutdown that results in an employment loss for 50 or more full-time employees. 29 U.S.C. § 2101(a)(2). A "mass layoff" is a reduction in force that results in an employment loss for either 50 or

more full-time employees composing a third of the work force, or 500 or more employees. 29 U.S.C. § 2101(a)(3). The WARN Act covers the railroad industry, and, AAR argues, the STB is violating the WARN Act by requiring notice in transactions not subject to its scope.

We find this argument completely devoid of merit. The fact that the WARN Act adopts a different size threshold for businesses required to provide notice is irrelevant. The STB was acting under the authority of Section 10502. AAR cites no authority to suggest that the WARN Act is exclusive or that it impliedly repeals any power of the Board. In fact, the WARN Act itself says that the rights provided thereunder are in addition to any other rights employees may have, and "are not intended to alter or affect such rights and remedies." *See* 29 U.S.C. § 2105.

### D. *The Five Million Dollar Threshold*

■ Finally, we consider AAR's contention that the Board's choice of a $5 million threshold was arbitrary and capricious and not in accordance with law. AAR argues that the Board did not provide a reasoned explanation for its choice of a $5 million threshold and that the size of the purchase, not the size of the entity, governs the impact of the transaction. AAR contends that the notice requirement applying to a $5,000 sale that pushed a company over the $5 million threshold, but not applying to a $4.5 million sale if it was to a startup entity, is an anomalous result showing that the $5 million threshold is irrational. Moreover, it argues, there are better thresholds to draw that would achieve the STB's stated goals with less impact on the smaller railroads. AAR suggests that the Board should have adopted higher thresholds. For example, a $250 million threshold would more closely match the point at which railroads become more labor intensive. Carriers with revenues of $250 million or more employ 89 percent of the

---

**2.** The conference report also supports the Board's distinction between procedural and substantive labor protections, stating that Section 10901(c) "eliminates the former optional authority to impose labor protection (*mandatory severance and salary and benefit protection*) to employees affected by [line] construction and operation cases." H.R. Conf. Rep. No. 104–422, at 179 (1995), *reprinted in* 1995 U.S.S.C.A.N. 850, 864 (emphasis added).

total number of rail freight employees. *See* Petitioners' Brief at 25–26.

While there is much in what AAR says, we do not find that the agency has committed a clear error of judgment. Our review of the STB's action is subject to Section 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

> We must uphold the [agency's] decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." ... Under the familiar arbitrary and capricious standard our scope of review ... is narrow and we should not substitute our judgment for that of the agency, but rather should determine whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. As part of this task, we must determine whether the agency articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.

*Michigan Consol. Gas Co. v. FERC*, 883 F.2d 117, 120–21 (D.C.Cir.1989) (internal quotations, brackets, and citations omitted).

While there may well be more logical thresholds, the Board was not required to choose one of them. *Ex Parte 562* shows that the Board considered AAR's position during the notice and comment period, as well as the opposing position of no threshold, and rejected both extremes.

> [W]e view the use of this threshold as providing a balance between the goals of providing for notice and a period of adjustment in transactions that will have the greatest effect on employees and their local communities while affecting the smallest number of carriers and transactions. We indicated in the NPR that 78% of the total number of freight railroads have annual revenues under $5 million, but employ fewer than 3% of the total number of rail freight employees; see "Selected Statistics—U.S. Freight Railroads by Revenue Range," *Profiles of U.S. Railroads—1996 Edition* (Association of American Railroads). Thus, the majority of transactions involving the creation of, or purchases by, Class III railroads should not be affected

by this notice requirement, but the $5 million limit should embrace the transactions that affect significant numbers of rail freight employees, and, hence, the communities in which they reside.

*Ex Parte No. 562*, slip op. at 7. The Board was attempting to "exclud[e] the vast majority of small railroads and small transactions from application of the notice requirement, while including the majority of affected employees and their communities." *Id.* at 7 n. 10. Given the conflicting positions, it was up to the Board to decide where to draw the line, and it did so rationally. *See FCC v. WNCN Listeners Guild*, 450 U.S. 582, 596, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1981) (agency has discretion to weigh competing policies under its statute).

### III. Conclusion

For the reasons stated, we uphold the Board's rulemaking. The 60–day notice requirement is permissible as an adjustment to its deregulation procedures promulgated under Section 10502, and the choice of a $5 million threshold strikes a permissible compromise between those who would have the notice requirement apply to all transactions, and those who would have it apply to none.