162 F.3d 101
 159 L.R.R.M. (BNA) 3041, 333 U.S.App.D.C. 211
 ASSOCIATION OF AMERICAN RAILROADS and Wisconsin Central
Ltd., Petitioners,
v.
SURFACE TRANSPORTATION BOARD and United States of America,
Respondents.
Transportation Trades Department, AFL-CIO, et al., Intervenors.
 Nos. 97-1384, 97-1397.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 1, 1998.
Decided Dec. 11, 1998.
 
 Thomas J. Litwiler argued the cause for petitioners. With him on the joint briefs were Robert H. Wheeler and Kenneth P. Kolson.
 Henri F. Rush, General Counsel, Surface Transportation Board, argued the cause for respondents. With him on the joint brief were Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, John J. Powers, III, and Robert J. Wiggers, Attorneys; and Louis Mackall, V, Attorney, Surface Transportation Board.
 Mitchell M. Kraus, Lawrence I. Willis and Clinton J. Miller, III were on the joint brief for intervenors Transportation Trades Department, AFL-CIO, and United Transportation Union.
 Before: WALD, SENTELLE and TATEL, Circuit Judges.
 Opinion for the Court filed by Circuit Judge TATEL.
 Separate opinion dissenting from Part II filed by Circuit Judge WALD.
 Separate opinion concurring in Parts I, II and IV and dissenting from Part III filed by Circuit Judge SENTELLE.
 TATEL, Circuit Judge:
 
 
 1
 Petitioners challenge the Surface Transportation Board's initial implementation of the ICC Termination Act's labor protection provisions for employees affected by short-line rail acquisitions. Agreeing with petitioners, we hold that the Board's order extending "severance pay" not just to employees who lose their jobs, but also to employees displaced to lower-paying jobs, violates the statute. We agree with the Board that its method of calculating severance payment offsets represents a reasonable interpretation of an ambiguous statutory term, and that it has authority under Circuit precedent to require mandatory arbitration of labor protection disputes.
 
 
 2
 * In 1995, Congress abolished the Interstate Commerce Commission and replaced it with the Surface Transportation Board. See ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1995) (codified at 49 U.S.C.A. § 10101 et seq. (1997)). Congress strictly confined the new agency's authority to impose labor protection conditions on Class II (mid-size) railroads involved in short-line rail acquisitions. See 49 U.S.C.A. § 10902 (1997). Under the prior statutory scheme, the ICC had authority to require railroads seeking expedited agency approval of rail line acquisitions to provide "a fair and equitable arrangement to protect the interests of the railroad employees affected." Railroad Revitalization and Regulatory Reform Act, Pub. L. No. 94-210, sec. 402(a), § 5(2)(f), 90 Stat. 31, 62 (1976) (amending Interstate Commerce Act). Pursuant to this authority, the ICC developed a standard basket of labor protection requirements known as the New York Dock conditions. These requirements included up to six years of income protection for terminated or displaced rail employees, training and relocation allowances, advance notice to labor unions, and mandatory arbitration. See New York Dock Ry.-Control-Brooklyn Eastern Dist. Terminal, 360 I.C.C. 60, aff'd sub nom. New York Dock Ry. v. United States, 609 F.2d 83 (2d Cir.1979). The ICC Termination Act specifies certain mandatory labor protection conditions, but expressly deprives the new Board of discretion to impose other labor protection conditions. See 49 U.S.C.A. § 10902(c) (the Board "may require compliance with conditions (other than labor protection conditions) the Board finds necessary in the public interest"). The labor protections mandated for mid-size railroads are as follows:
 
 
 3
 The Board shall require any Class II rail carrier which receives [expedited approval of a rail line acquisition] to provide a fair and equitable arrangement for the protection of the interests of employees who may be affected thereby. The arrangement shall consist exclusively of one year of severance pay, which shall not exceed the amount of earnings from railroad employment of the employee during the 12-month period immediately preceding the date on which the application for such certificate is filed with the Board. The amount of such severance pay shall be reduced by the amount of earnings from railroad employment of the employee with the acquiring carrier during the 12-month period immediately following the effective date of the transaction....
 
 
 4
 Id. § 10902(d).
 
 
 5
 In the first proceedings under new section 10902(d), petitioner Wisconsin Central (a Class II railroad) sought expedited Board approval of its acquisition of two short rail lines from Union Pacific. Running for 17.8 miles, the lines provide local service between Hayward Junction and Hayward, Wisconsin, and terminal service in the pocket between Wausau and Schofield. To comply with section 10902(d)'s mandatory labor protection requirement, Wisconsin Central proposed making severance payments to each of the nine rail employees who would lose their jobs with Union Pacific in amounts equal to their railroad earnings during the previous twelve months. Severed employees rehired by Wisconsin Central would, as authorized by section 10902(d)'s offset provision, have their severance pay reduced each month by their Wisconsin Central earnings. See Wisconsin Central Ltd.-Acquisition Exemption-Lines of Union Pacific R.R. Co., Finance Docket No. 33116, at 2 (STB Nov. 15, 1996), available in 1996 WL 681474.
 
 
 6
 Announcing that "[t]he labor protective arrangement that results from this proceeding may be used as a model for conditions we impose governing the minimum labor protective arrangements we require with respect to acquisitions by Class II railroads," the Board sought public comment on "whether [Wisconsin Central's] proposed arrangement meets the statutory requirements, and on whether and to what extent we should establish and/or oversee the procedural aspects of labor protective arrangements under this statute." Id. at 1. The Transportation Trades Department of the AFL-CIO ("TTD") urged the Board to define "affected" employees broadly to include displaced as well as terminated employees, to calculate the offset on the basis of the number of hours worked during the previous twelve months, to impose a 90-day notice requirement before consummation of proposed line acquisitions, and to require arbitration of disputes. See Wisconsin Central Ltd.-Acquisition Exemption-Lines of Union Pacific R.R. Co., Finance Docket No. 33116, at 3 (STB Apr. 16, 1997), available in 1997 WL 186804. Petitioners Wisconsin Central and the Association of American Railroads submitted comments arguing that the ICC Termination Act limits the Board's oversight role to assuring compliance with the statute's straightforward one-year severance pay requirement for employees who lose their jobs with the selling rail carrier, that it authorizes no protection for displaced employees, and that it deprives the Board of authority to impose additional "procedural" labor protection requirements, including arbitration. See id. at 2-3.
 
 
 7
 The Board adopted virtually all of TTD's proposals. First, it "agree[d] with TTD that affected employees should be defined not only as including employees losing positions with the selling carrier, but also to cover those employees who, in order to continue working on the selling carrier, must exercise seniority and employees of the selling carrier who are adversely affected by those other workers' exercise of seniority." Id. at 5 (emphasis added). In other words, the Board extended labor protection to employees forced by an acquisition to transfer to different--and presumably lower-paying--jobs elsewhere on the selling carrier. Second, the Board adopted TTD's suggestion that "the employee's earnings should be based on the same number of hours worked during each comparable month before and after the transaction." Id. at 5 & n. 7. Finally, it required arbitration of disputes, permitting appeal pursuant to the substantially deferential Lace Curtain standard, under which the Board reviews recurring or otherwise significant issues of general importance and reverses an arbitrator's decision only for egregious error. See id. at 5-6 (citing Chicago & North Western Transp. Co.-Abandonment-Near Dubuque & Oelwein, Ia., 3 I.C.C.2d 729 (1987) (Lace Curtain), aff'd sub nom. International Bhd. of Elec. Workers v. ICC, 862 F.2d 330 (D.C.Cir.1988)).
 
 
 8
 Subject to these conditions, the Board approved Wisconsin Central's acquisition of Union Pacific's rail lines. With respect to TTD's suggestion for an advance notice requirement, the Board noted that Wisconsin Central had already satisfied any such requirement and postponed the issue for another proceeding, eventually imposing a 60-day notice requirement. See Acquisition of Rail Lines Under 49 U.S.C. 10901 and 10902-Advance Notice of Proposed Transactions, Ex Parte No. 562 (STB Sept. 2, 1997), available in 1997 WL 555638. We sustained that requirement in Association of American Railroads v. STB, No. 97-1624, 1998 WL 791857, 161 F.3d 58 (D.C.Cir. Nov. 17, 1998).
 
 
 9
 Wisconsin Central and the American Association of Railroads now petition for review, challenging each element of the labor protection conditions the Board imposed on Wisconsin Central's proposed line acquisition. Specifically, they argue that the extension of severance pay to displaced employees, the calculation of earnings based on time worked, and the arbitration requirement run counter to the plain meaning of section 10902(d). Taking up each argument in turn, we review the Board's interpretation of the ICC Termination Act under Chevron's two-step analysis. See Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We ask first "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. 2778. But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. 2778.
 
 II
 
 10
 We begin with petitioners' challenge to the Board's inclusion of displaced employees within section 10902(d)'s "severance pay" requirement for "affected" employees. In defense of its position, the Board relies on section 10902(d)'s requirement of "a fair and equitable arrangement for the protection of the interests of employees who may be affected" by line sales. According to the Board, the class of employees "affected" by line sales includes, but is not limited to, employees whose employment relationship is severed; displaced employees are also "affected" by line sales. The Board reads section 10902(d)'s second sentence--"[t]he arrangement shall consist exclusively of one year of severance pay"--not as a limitation on the class of employees protected by the Act (as petitioners urge), but rather as a limit on the amount of compensation that "affected" employees may receive. In other words, all affected employees, whether severed or displaced, must receive one year of severance pay.
 
 
 11
 We cannot square the Board's position with the statute's plain language. To begin with, section 10902(d)'s use of the term "severance pay" indicates that Congress intended to limit the class of covered employees to those whose employment with the selling carrier was terminated as a result of a transaction. Webster's defines "severance pay" as "an allowance usu[ally] based on length of service that is payable to an employee on severance." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993). "Severance" means the "termination of a contractual association (as employment)." Id.; see also BLACK'S LAW DICTIONARY (6th ed.1990) (defining severance pay as "[p]ayment by an employer to employee beyond his wages on termination of his employment"). Making clear Congress's understanding that the "arrangement" applies to severed employees, the conference report describes section 10902(d)'s arrangement as: "Class II rail carriers acquiring a line under this section are subject to a mandatory 1 year severance pay requirement for severed employees...." See H.R. CONF. REP. NO. 104-422, at 180 (1995) (emphasis added), reprinted in 1995 U.S.C.C.A.N. 850, 865 ("Conference Report"). During floor debate, moreover, several members described the arrangement now contained in section 10902(d) as providing one year of severance pay for severed employees. See, e.g., 141 CONG. REC. H 12,301 col. 2 (daily ed. Nov. 14, 1995) (Rep. DeFazio) (explaining the provision as "one [year] of severance for the employees who lose their jobs"); id. at H12,302 col.1 (Rep. Rayhall) (characterizing the provision as a "dramatically reduced 1 year of severance pay, when the employee is eligible, in the event he or she loses a job as a result of a merger or other transaction of that nature"); id. at H12,303 col.1 (Rep. Johnson) (describing the provision as providing that "[e]mployees who lose their jobs get a 1 year severance").
 
 
 12
 Not only does the use of the term "severance pay" demonstrate Congress's intention to apply the "arrangement" to severed employees, but section 10902(d)'s limiting language and structure make it equally clear that Congress left no room for the Board to extend benefits to other employees. Mirroring the first sentence's requirement of "a fair and equitable arrangement for the protection of the interests of employees who may be affected," section 10902(d)'s second sentence provides quite specifically that "[t]he arrangement shall consist exclusively of one year of severance pay." Because section 10902(d) defines the arrangement for the protection of affected employees as consisting exclusively of one year of severance pay, and because severance pay is paid only to employees who actually lose their jobs, the Board has no authority to extend severance pay to displaced employees. Confirming this interpretation, section 10902(d)'s third sentence requires that "[t]he amount of such severance pay shall be reduced by the amount of the earnings from railroad employment of the employee with the acquiring carrier." The only employees who could possibly have "earnings ... with the acquiring carrier" are employees who lose their jobs on the selling carrier as a result of the line sale and then take jobs on the acquiring carrier.
 
 
 13
 The legislative evolution of section 10902(d) also confirms that Congress intended to limit protection to severed employees. The Interstate Commerce Act, as amended in 1940, contained only the first sentence of what has now become section 10902(d)--"[T]he Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected." Transportation Act of 1940, ch. 722, sec. 7, § 5(2)(f), 54 Stat. 899, 906 (1940) (amending Interstate Commerce Act). It was on the basis of this language that the ICC developed the extensive New York Dock protections, which covered both severed and displaced employees. See New York Dock Ry., 609 F.2d at 87-90. As originally introduced in Congress, the ICC Termination Act eliminated all substantive labor protections. See H.R. 2539, 104th Cong., 141 CONG. REC. H 12,266-96. Concerned about "employees who lose their jobs because of a merger," members who favored labor protection focused on the harm caused by layoffs and the loss of jobs, and urged a compromise that would "leave the essential employee protections in place." 141 CONG. REC. H 12,258 col.1 (statement of Rep. Vento) (emphasis added); see also, e.g., id. at 12,260 col.1 (statement of Rep. Oberstar) (urging protection for "railworkers ... [who] lose their jobs due to mergers and line sales"). Although Congress eventually incorporated the Interstate Commerce Act's "fair and equitable arrangement" language into the final bill, it added the requirement that "the arrangement shall consist exclusively of one year of severance pay." See Conference Report at 179-80. The addition of the words "shall consist exclusively of" to the previous Act's "fair and equitable arrangement" shows that Congress intended to deprive the new Board of authority to impose New York Dock-style conditions for the benefit of displaced employees.
 
 
 14
 We also think it significant that to accommodate its interpretation of the statute, the Board found it necessary not just to ignore the Act's plain language, but to change it. The Board realized that extending section 10902(d)'s offset provision to displaced employees could "create the anomaly where an affected employee electing not to work for WCL, but remaining with UP, would double his previous year's income." Wisconsin Central Ltd.-Acquisition Exemption-Lines of Union Pacific R.R. Co., supra, at 106. The Board therefore ruled that the severance payment offset applies to "earnings from the employee's railroad employment" irrespective of whether the selling or acquiring railroad is the employer. In other words, the Board rewrote the statute to read: "The amount of such severance pay shall be reduced by the amount of the earnings from railroad employment of the employee [DELETED: with the acquiring carrier] during the 12-month period immediately following the effective date of the transaction...."
 
 
 15
 Judge Wald argues that interpreting section 10902(d) to exclude displaced employees "doesn't make sense." Dissenting Op. at 109 (Wald, J.). Although she (and the Board) may be correct that displaced employees deserve protection, Congress could just as sensibly have decided to limit benefits only to employees whose employment with the selling carrier is actually terminated. Indeed, we recently rejected an agency's attempt to redraft a statute in order to avoid what the agency characterized as the "absurd results" that would flow from the statute's language because we found it "not inconceivable that Congress meant what the statute says." See Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1072 (D.C.Cir.1998).
 
 
 16
 Finding Congress's intent clear from the statute's language, structure, and legislative history, we have no need to proceed, as the Board urges, to Chevron's second step.
 
 III
 
 17
 Petitioners next challenge the Board's interpretation of section 10902(d)'s requirement that severance pay shall be "reduced by the amount of earnings from railroad employment of the employee with the acquiring carrier during the 12-month period immediately following the effective date of the transaction." According to petitioners, calculating "the amount of earnings" is mechanical and self-executing, leaving no room for Board interpretation; employees' severance payments must be reduced by their one-year aggregate earnings on the acquiring carrier. Finding the term "earnings" ambiguous, the Board interprets the offset provision in a way that matches earnings in the year following the line sale to earnings in the prior year based on the number of hours worked. Earnings from the acquiring carrier that are attributable to hours worked in excess of hours worked in the previous year are in effect considered extra earnings and excluded from the offset calculation.
 
 
 18
 The Board adopted this proposal in response to TTD's suggestion that "the monthly comparison [should be] 'apples to apples'; i.e., the comparison [should be] made for the same number of hours worked in a month so that the employee who works at a position at a lower hourly rate for more hours does not lose protective benefits and reduce the carrier's obligations by working more hours for less pay." See Comments of TTD, Wisconsin Central Ltd.--Acquisition Exemption--Lines of Union Pacific R.R. Co., Finance Docket No. 33116, at 14-15 (filed with STB Jan. 15, 1997). TTD illustrated its point with the following example: If a severed employee earned $2,500 monthly for 160 hours of work with the selling carrier and then earns $2,500 monthly for 320 hours of work with the acquiring carrier, the employee would be entitled to a monthly severance payment of $1,250 under the Board's "apples to apples" approach but would receive no benefits under petitioners' interpretation.
 
 
 19
 This issue is quite different from the Board's extension of severance benefits to displaced employees, where Congress's use of the term "exclusively," together with the statute's structure and legislative history, demonstrated that the Board had exceeded its statutory authority. See supra at 104-06. In contrast, Congress has not "directly spoken" to the question of precisely how the earnings offset should be calculated. Although section 10902(d) limits the offset to the 12-month period following the transaction, the statute contains no definition of "earnings." Are "earnings" based on gross earnings or net earnings? Are overtime earnings "earnings"? How do payroll deductions for health insurance and employer contributions to pension benefits count in the employee's "earnings"? Neither legislative history nor any other tool of statutory construction aids us in ascertaining Congress's intent with respect to the measurement of earnings under this statute.
 
 
 20
 Had Congress intended to limit the term earnings in the way that petitioners and Judge Sentelle read it, it could have used the words "full" or "total" prior to "earnings." As Congress demonstrated in section 10902(d)'s second sentence, where it used the words "[t]he arrangement shall consist exclusively of one year of severance pay," it knows how to limit the Board's authority to interpret statutory language. Although Congress knew of the ICC's practice of calculating earnings offsets based on comparable hours worked, it left "earnings" unmodified in the new statutory scheme. We therefore read section 10902(d) as a "legislative delegation to [the] agency" to elucidate the statute's earnings offset provision. Chevron, 467 U.S. at 844, 104 S.Ct. 2778.
 
 
 21
 Moving to Chevron's second step, we cannot say that the Board's "apples to apples" approach represents an impermissible construction of the offset requirement. The Board crafted its interpretation of earnings to respond to a practical problem identified by TTD--that acquiring carriers paying lower wages could avoid making severance payments by simply requiring employees to work more hours than they had in the previous year. TTD argued that this adverse incentive could potentially "destroy the effectiveness of the protection imposed by Congress" and "lead to abuse by employers and dangerous situations for tired employees." Intervenor-Respondents' Br. at 17, 18. Whether this amounts to a serious problem or whether the Board has fashioned the best solution is for the Board to decide, not us. Our deference to an agency's reasonable interpretation of its governing statute "is a product both of an awareness of the practical expertise which an agency normally develops, and of a willingness to accord some measure of flexibility to such an agency as it encounters new and unforeseen problems over time." International Bhd. of Teamsters v. Daniel, 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979). And unlike the Board's extension of the severance pay arrangement to displaced employees, which compelled it to disregard explicit statutory language to accommodate its interpretation, here the Board ignores no words in the statute, but merely interprets the term "earnings."
 
 IV
 
 22
 Petitioners next claim that the Board unlawfully delegated resolution of disputes arising under section 10902(d) to private arbitrators. According to petitioners, because the statute nowhere authorizes arbitration, the Board cannot require it.
 
 
 23
 Circuit precedent forecloses petitioners' argument. In Brotherhood of Locomotive Engineers v. ICC, we considered a similar argument (in that case advanced by the labor union) that "the Commission, by submitting the labor disputes to arbitration ... failed to exercise its 'primary jurisdiction' in accordance with [the section requiring the Commission to impose labor protective conditions]." 808 F.2d 1570, 1579 n. 75 (D.C.Cir.1987). Holding that "[a]rbitration is a legitimate method of resolving labor disputes and does not divest the Commission of its jurisdiction," we declined to "mandate that the Commission adjudicate disputes that it properly determines to be arbitrable." Id. We reached a similar result in International Brotherhood of Electrical Workers v. ICC, supra. Observing that "[n]othing in the Act either requires or forecloses the agency's use of arbitration in employee disputes," we concluded that "[t]he ICC acted within its sound discretion in electing to use arbitration; had it not done so, all disputes over employee protective conditions would have remained solely within the primary jurisdiction of the agency." 862 F.2d at 336. Because the ICC Termination Act makes no change with respect to the Board's inherent authority to require arbitration, IBEW and Brotherhood of Locomotive Engineers control here.
 
 V
 
 24
 We grant the petition for review and hold that the Board's order requiring compensation of displaced employees violates section 10902(d) of the ICC Termination Act. We sustain the Board's interpretation of earnings based on comparable hours worked and its requirement of mandatory arbitration as permissible constructions of the statute.
 
 
 25
 So ordered.
 
 WALD, Circuit Judge, dissenting from Part II:
 
 26
 I disagree with the panel that the statutory provision for severance pay for rail workers who lose their jobs as a result of short-line acquisitions under section 10902(d) is unambiguously limited to workers who after the acquisition will no longer work for the selling railroad. In my view, the text of the relevant provision is decidedly ambiguous, the legislative history sheds no appreciable additional light on its meaning, and I would therefore proceed to a Chevron step two analysis, which defers to the Surface Transportation Board's ("the Board") reasonable determination that all employees who lose their jobs as a result of a short-line acquisition--including those who go on to other less well-paying employment with the selling carrier--are entitled to some amount of severance pay.
 
 
 27
 The ICC Termination Act first authorizes the Board to require a covered rail carrier to "provide a fair and equitable arrangement for the protection of the interests of employees who may be affected" when one Class II railroad buys a short line from any other railroad. 49 U.S.C. § 10902(d). The next sentence goes on to define the meaning of that "arrangement": "The arrangement shall consist exclusively of one year of severance pay...." Id. Thus, the second sentence tells the Board what the arrangement is but does not delimit who is entitled to receive it. The Board is left to decipher which "employees [ ] may be affected thereby."
 
 
 28
 Under the ruling of Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the panel finds that Congress has unequivocally made its intention clear that only employees of a short line who leave the employment of the seller of that line altogether are eligible for severance pay. It reasons that since "severance pay" is the only available remedy for "employees who may be affected" by an acquisition, it must follow that only "severed employees" are eligible for "severance pay." This of course is essentially a tautology. The panel then elaborates a bit by quoting a dictionary definition that defines "severance" as "termination of a contractual association (as employment)," see Majority Opinion ("Maj. Op.") at 104. Building on this somewhat scrawny framework, the panel extrapolates that a "severed employee" can only be one terminated from his employment relationship with the particular employer who used to own the short line and cannot mean someone who has been severed from his former job but still works for the former owner of the short line. Yet nothing in the statute's text, its history, or even the dictionary definition of severance pay suggests that limitation.
 
 
 29
 Rather, "severance pay"--certainly in the context of this statute--is an ambiguous term not confined to employees "whose employment with the selling carrier was terminated as a result of a transaction." Maj. Op. at 104. The ICC Termination Act, as originally introduced in the House, eliminated all labor protective conditions, known as New York Dock conditions, traditionally imposed by the ICC in mergers and line acquisitions. A compromise struck on the floor of the House of Representatives between those who favored some labor protection and those who opposed it resulted in adoption of the Whitfield Amendment, which we now construe. There was no indication in the floor debate preceding the amendment's passage that lawmakers had achieved any meeting of the minds as to what exactly "severance pay" encompassed. Instead, the entire discussion addressed the compromise in terms of the shortening of the post-acquisition period during which salary protection was available, from six years under New York Dock, to one year under the amendment. See 141 CONG. REC. H12,297-306 ( daily ed. Nov. 14, 1995). The issue of just who qualified as an "employee affected" so as to merit "severance pay" was never directly confronted.
 
 
 30
 The panel's restrictive definition of the term "severance pay" had never been employed as a term of art by the ICC, nor was it a definition unequivocally embraced by members of Congress who debated the amendment. Under the New York Dock regime, an acquiring railroad was required to make two types of allowances--"displacement allowances" and "dismissal allowances." The former allowance was for employees who were placed in worse positions with respect to their compensation as a result of a rail transaction, regardless of whom they worked for after the transaction; the latter was for employees who lost their jobs entirely because of a transaction. See New York Dock Ry.-Control-Brooklyn Eastern Dist. Terminal, 360 I.C.C. 60 app. III (Feb. 9, 1979). The term "severance pay" was often used by the ICC and reviewing courts to describe the combination of these two allowances. See, e.g., Santa Fe Pacific Corp.-Control-Southern Pacific Transp. Co., Finance Docket No. 30400 (Sub-No. 21) (I.C.C. June 12, 1992), available in 1992 ICC Lexis 114; Indiana R.R. Co.-Merger, 6 I.C.C. 969 (1990); see also Railway Labor Executives' Ass'n v. ICC, 999 F.2d 574, 575 n. 2 (D.C.Cir.1993); Brotherhood of R.R. Signalmen v. ICC, 63 F.3d 638, 639 (7th Cir.1995). Indeed some members of Congress also used the term "severance pay" as shorthand for the old New York Dock salary protections in debating the Whitfield Amendment. See 41 CONG. REC. H12,302 col. 1 (statement of Rep. Nadler); id. at H12,304 col. 3 (statement of Rep. Traficant); id. at H12,305 col. 2 (statement of Rep. Oberstar); id. at H12,306 col. 1-2 (statement of Rep. Spratt) (under old regime "Congress gave the ICC discretion to require 6-year severance payments to rail workers displaced by mergers or acquisitions").[1] Both allowances were calculated on a monthly "time paid for" basis, which is the payment calculation scheme the Board has proposed for implementing the term "earnings" in section 10902(d) and which as part of the majority in Part III of the opinion I accept.[2]
 
 
 31
 The panel argues that the Board has to rewrite the statute to provide for offsets to severance pay for employees who take lower paid positions in their old company in order to avoid giving them a windfall. Inevitably, as Judge Sentelle complains in his dissent, we do a bit of rewriting with respect to the term "earnings" in section 10902(d), Maj. Op. at 105, in order to arrive at a "fair and equitable arrangement." What is one judge's rewriting is another's gap-filling. In this case I believe that Congress probably focused on an offset for employment with the acquiring railroad in order to create an economic incentive for the acquiring railroad to hire workers displaced from the acquired line. Under the ICC regime, when Class II carriers were granted exemptions from labor protections, the average percentage of employees with the selling carrier who went to work for the new operator was 85 percent. See 41 CONG. REC. H12,303 col. 1 (statement of Rep. Shuster). Congress may well have wanted to keep that figure high by alleviating the new company's financial burden when that happened. When the Board later defined those included in the severance pay eligible group, it made the offset accommodation to make sure that affected employees played on a level field whether they took new jobs with their old company or went to work for the new one.
 
 
 32
 Finally, and most important, the panel's rejection of the Board's interpretation creates a distinct and I believe inequitable anomaly in the treatment of affected railroad workers. Under the panel's interpretation, when an acquiring railroad (A) buys a line (line B) from the selling railroad (B), the following employees are entitled to severance pay: any worker dismissed from line B who takes a lower-paying job with A; any worker dismissed from line B who takes a lowerpaying job with any railroad other than B (in this case, A will have to pay the former B worker his full wages for a year with no offset); and any worker who keeps his same job but at a lower rate of pay on line B but who is now an employee of A. The only "employee[ ] who may be affected" by the acquisition who will not get any severance pay is one who loses his job on line B and takes a different lower-paying job with B. But presumably if that employee by dint of seniority bumps another worker in railroad B from his job, the bumped employee will be considered "severed" and will be entitled to severance pay. Such a disparity doesn't make sense and there is no signal from Congress that this is what it intended.
 
 
 33
 For these reasons, I would defer to the Board's reasonable interpretation of section 10902(d) as to who is eligible for "severance pay," as well as the other challenged parts of its ruling.
 
 
 34
 SENTELLE, Circuit Judge, concurring in Parts I, II and IV and dissenting from Part III:
 
 
 35
 I fully concur with the opinion of the court in Parts I and II. Indeed, I find the legal reasoning in Part II to be a commendably clear and unassailably correct application of Chevron analysis. My difficulty with the majority's opinion lies in the fact that the cogent reasoning of Part II commands an opposite result than that reached by the court in Part III. I, therefore, respectfully dissent from the court's decision approving the Board's construction of the term "earnings."
 
 I.
 
 36
 As the court declares, "we review the Board's interpretation of the ICC Termination Act under Chevron's two-step analysis." Maj. op. at 104 (citing Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). As the court further notes, it is our duty to "ask first 'whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.' " Id. at 104 (quoting Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778). Only if the statute is " 'silent or ambiguous with respect to the specific issue' " before us do we proceed to the second step of determining " 'whether the agency's answer is based on a permissible construction of the statute.' " Id. (quoting Chevron, 467 U.S. at 843, 104 S.Ct. 2778). In the ICC Termination Act, 49 U.S.C. § 10101 et seq. (1997), Congress provided that the Surface Transportation Board "shall require any Class II rail carrier" receiving the expedited acquisition approval applicable in this case "to provide a fair and equitable arrangement for the protection of the interests of employees ... affected thereby." Id. § 10902(d). Had Congress stopped there, there would obviously be a broad ambiguity as to the meaning of "a fair and equitable arrangement" and it might well be that we would uphold everything the Board did in this case. But, as the court's opinion demonstrates, Congress did not stop there.
 
 
 37
 Congress went on to specify precisely what it meant by "a fair and equitable arrangement." As the court's opinion says, "[t]he ... Act specifies certain mandatory labor protection conditions, but expressly deprives the new Board of discretion to impose other labor protection conditions." Maj. op. at 102 (citing 49 U.S.C.A. § 10902(c) (the Board "may require compliance with conditions (other than labor protection conditions) the Board finds necessary in the public interest")). As the court notes, this language is not only crystal clear, it is obviously expressive of the deliberate intent of Congress reached after debate and compromise. See id. at 104-05. In other words, Congress had determined and stated what it deemed to be the "fair and equitable arrangement" it was requiring. Therefore, there was no need for this court to reason beyond the first step of Chevron. Congress had determined what the Board could require a railroad conducting an expedited acquisition to provide to affected employees, and the Board was without discretion to expand it. I fear that the court departs from that unassailable reasoning in Part III.
 
 
 38
 Just as Congress clearly capped the required payments under § 10902(d) at "one year of severance pay," Congress also clearly defined the method of computation of that benefit. The exclusive benefit "shall not exceed the amount of earnings from railroad employment of the employee during the 12-month period immediately preceding" the date of application, which "shall be reduced by the amount of earnings from railroad employment of the employee with the acquiring carrier during the 12-month period immediately following the effective date of the transaction...." 49 U.S.C. § 10902(d) (emphasis added). Instead of following the congressional formula, the Board has adopted, and the court today allows, a computation in which the payment is not "reduced by the amount of earnings ... during the 12-month period" but instead allows reduction only for amounts computed monthly based not on the earnings of the affected employee, but rather on the per-hour return for the hours worked by that employee. Shortly put, Congress expressly mandated a reduction in the severance pay "by the amount of earnings from railroad employment" of the employee with the acquiring carrier during the relevant 12-month period. The Board, instead of following this plain mandate, reduces only when a reduction appears to it proper under a monthly computation based not on the earnings from railway employment, but on the hourly rate of the wage earner. The court, abandoning its allegiance to the clearly expressed intent of Congress demonstrated in Part II, approves this unwarranted assertion of authority under a misapplication of the Chevron doctrine.
 
 
 39
 The court justifies its move to Step II of Chevron by declaring that "Congress has not 'directly spoken' to the question of precisely how the earnings offset should be calculated." Maj. op. at 106. To support this proposition, the majority offers the silence of the statute on whether earnings includes such things as "payroll deductions for health insurance and employer contributions to pension benefits." Id. This, however, ignores the Supreme Court's plain language in Chevron. The deference we afford an agency under that decision arises when "the statute is silent or ambiguous with respect to the specific issue." 467 U.S. at 843, 104 S.Ct. 2778 (emphasis added). Granted, the statute is ambiguous on what to do with medical and pension benefits. The statute is not ambiguous on the question of whether the severance pay "shall be reduced by the amount of earnings from railroad employment of the employee with the acquiring carrier during the 12-month period immediately following the effective date of the transaction." 49 U.S.C. § 10902(d). It shall. There is no ambiguity as to whether the earnings to be used are monthly, hourly or annual. They are annual. They are not monthly computed, and they are not hourly adjusted. The payment is to be reduced by what the employee earns from railroad employment during the next 12-month period. That was the expressed intent of Congress. That should be the end of our analysis on this question.
 
 
 40
 The majority further purports to find the ambiguity it seeks in the language of § 10902(d) which requires "that the Board fashion a 'fair and equitable' severance arrangement." Maj. op. at 106. Granted, that phrase taken out of the context of the statute may look ambiguous. But phrases in a statute are not without context. As the majority clearly demonstrates in Part II, Congress defined what it meant by a "fair and equitable" arrangement. It said what that arrangement consists of. It consists of severance pay "reduced by the amount of earnings from railroad employment of the employee with the acquiring carrier during the 12-month period immediately following the effective date of the transaction." 49 U.S.C. § 10902(d). The Board seizes the power of Congress when it seeks to redefine that "fair and equitable arrangement," and this court today aids and abets it. I therefore dissent from that part of the opinion.
 
 II.
 
 41
 I have thus far been silent as to Part IV of the majority opinion. I do concur in that section, but in doing so I wish to comment separately on what I understand the court not to be doing. As the majority notes, the Board requires the submission to arbitration of disputes regarding the application and implementation of the § 10902(d) conditions. The Board does so without any discernible explanation, rationale, or basis for its decision that it has the power to issue this requirement or the ability to make such delegation to a private arbiter. It cannot be gainsaid that the submission of a dispute to arbitration is normally a voluntary act, either at the time of the dispute or at an earlier time in a contract providing for such arbitration. It is equally undeniable "that when Congress has specifically vested an agency with the authority to administer a statute, it may not shift that responsibility to a private actor." Perot v. Federal Election Comm'n, 97 F.3d 553, 559 (D.C.Cir.1996); National Small Shipments Traffic Conference, Inc. v. ICC, 725 F.2d 1442, 1450 (D.C.Cir.1984) (ICC may delegate certain ministerial functions to staff but decision making must remain with commission); Krug v. Lincoln Nat'l Life Ins. Co., 245 F.2d 848, 852 (5th Cir.1957) (administrative agency cannot delegate quasi-judicial functions); Relco, Inc. v. Consumer Prod. Safety Comm'n, 391 F.Supp. 841, 845 (S.D.Tex.1975) ("administrative adjudications" may not be delegated). That said, I nonetheless agree with the majority that we must uphold the Board's unexplained delegation in this case.
 
 
 42
 The reason for our anomalous holding is well set out by the majority. That is, circuit precedent forecloses the opposite result. In both Brotherhood of Locomotive Engineers v. ICC, 808 F.2d 1570 (D.C.Cir.1987), and International Bhd. of Elec. Workers v. ICC, 862 F.2d 330, 336 (D.C.Cir.1988), we upheld similar delegations by the Board of disputes not submitted to voluntary arbitration by agreement of the parties. Circuit precedent binds us unless and until it is overruled by this court sitting en banc or by the higher authority. Save Our Cumberland Mountains, Inc. v. Hodel, 826 F.2d 43, 49 (D.C.Cir.1987), vacated in part, 857 F.2d 1516 (D.C.Cir.1988) (en banc). I, therefore, concur in the majority's determination that binding precedent requires us to uphold the Board's otherwise unsupported decision to delegate these disputes to private arbitration. I do not, however, understand our decision to be providing any precedent for any other agency to act. Our precedent speaks by its terms and binds by its terms, and I do not think we are today intending to create a precedent empowering any other administrative agency to delegate disputes before it to private actors without the consent of the parties.
 
 
 43
 I find one other aspect of the delegation troubling. The Board's position seems to be that the decision of the private arbitrators would be reviewed by the Board only under the restrictive "Lace Curtain" standards. See Chicago and Northwestern Transp. Co.-Abandonment-Near Dubuque and Oelwein, IA, 3 I.C.C.2d 729 (1987) (Lace Curtain), aff'd sub nom. International Bhd. of Elec. Workers v. ICC, 862 F.2d 330 (D.C.Cir.1988). The Board reiterated this proposition at oral argument. As I understand the Lace Curtain standard, the Board will only review the arbitrator's decision for "recurring or otherwise significant issues of general importance regarding the interpretation" of labor protection conditions, and will not review decisions dealing with factual questions. Id. at 736. The Administrative Procedure Act entitles administrative litigants before the Board or any other administrative agency to a review of the final agency decision under an arbitrary and capricious standard in which the reviewing court will subject fact findings to a substantial evidence review. See McCarty Farms, Inc. v. STB, Nos. 97-1632 and 98-1307, 158 F.3d 1294, 1998 WL 726248, at * 7 (D.C.Cir.1998); MD Pharmaceutical, Inc. v. Drug Enforcement Admin., 133 F.3d 8, 16 (D.C.Cir.1998) (explaining the standard of judicial review under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (E)). I do not understand our decision today to be a statement that the Board can apply the Lace Curtain standard to involuntary arbitrations and thereby finesse a litigant out of that statutory right. If in future cases the Board attempts such a bypass of the statutory right, it may be that we will be required to directly review the arbitrator's decisions on such matters as final agency decisions, see International Bhd. of Elec. Workers, 862 F.2d at 337-38, or that some other remedy can be found. In any event, I do not read today's decision as approving the Board's standard of review.
 
 III.
 
 44
 For the reasons set forth above, I concur in the decision of the majority as to the construction of the term "severance pay" but not as to its computation. As to that latter portion of the decision, I dissent.
 
 
 
 [1]
 Notably, the seminal ICC case discussing the evolution of the New York Dock conditions describes the employees who were eligible for displacement and dismissal allowances as "severed and dismissed employees." Oregon Short Line R.R. and Union Pacific R.R. Co.-Abandonment Portion Goshen Branch, 354 I.C.C. 76 (July 22, 1977), available in 1977 ICC Lexis 75, * 15
 
 
 [2]
 Of course, I do not accept the argument in Part III that the term "severance pay" is patently unambiguous on the one hand, but that we should defer to the Board's experience in administering "earnings"--an ambiguous term--on the other. Rather, we should interpret both terms guided by "an awareness of the practical expertise which an agency normally develops, and of a willingness to accord some measure of flexibility to such an agency as it encounters new and unforeseen problems over time." International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), cited in Maj. Op. at 107