Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 11, 2003     Decided October 28, 2003

No. 97-1300

DOMTAR MAINE CORPORATION, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PASSAMAQUODDY TRIBE,
INTERVENOR

———

Consolidated with
No. 02-1178

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Catherine R. Connors* argued the cause for petitioner. With her on the briefs was *Matthew D. Manahan*.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*David H. Coffman*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor. *Susan J. Court*, Special Counsel, entered an appearance.

*Gregory W. Sample* argued the cause and filed the brief for intervenor.

Before: Edwards, Randolph, and Tatel, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* Tatel.

Tatel, *Circuit Judge*: The Federal Power Act of 1920, 16 U.S.C. § 791a *et seq.*, requires licensing of all dams operated on navigable waters for the purpose of generating electric power, except those authorized by a valid pre-Act permit. In this case, we must decide whether two dams are exempt from licensing because their owner operates other dams downstream pursuant to such a permit. The Federal Energy Regulatory Commission found them not exempt. Because we agree, and because we find no error in FERC's challenged orders, we deny the petitions for review.

## I.

Section 4(e) of the Federal Power Act (FPA) authorizes the Federal Energy Regulatory Commission to "issue licenses . . . for the purpose of constructing, operating, and maintaining dams, . . . reservoirs, . . . or other project works necessary or convenient for the . . . development, transmission, and utilization of power across, along, from, or in any . . . bodies of water over which Congress has jurisdiction. . . ." 16 U.S.C. § 797(e) (2000). Section 23(b)(1) makes it "unlawful . . ., for the purpose of generating electric power, to construct, operate, or maintain any dam, . . . reservoir, . . . or other works incidental thereto across, along, or in any of the navigable waters of the United States," unless FERC has issued a proper license. *Id.* § 817(1). That section, however, exempts any facility operating "under and in accordance with

the terms of a permit or valid existing right-of-way granted prior to June 10, 1920," the date the FPA became law. *Id.*

Petitioner, Domtar Maine Corporation, owns several hydroelectric facilities in eastern Maine. Its Forest City facility, located along the U.S.-Canadian border on the east branch of the St. Croix River, includes "a 16-foot-high, 500-foot-long dam, and a 16,070-acre reservoir." *Ga.-Pac. Corp.*, 78 F.E.R.C. ¶ 61,223, 61,953 (1997). Domtar's West Branch facility, located on the west branch of the St. Croix, comprises two developments, each of which also includes a dam and a reservoir. *Id.* Both of Domtar's facilities enhance the power-generating capabilities of two downstream projects that Domtar also operates, Woodland and Grand Falls. Forest City is thirty-five miles upstream from Grand Falls and forty-seven from Woodland; West Branch is ten miles upstream from Grand Falls and twenty-two from Woodland. *Id.* Although FERC licensed the two upstream facilities in 1980, it never licensed the downstream projects because they operate pursuant to a 1916 Act of Congress, *see* Pub. L. No. 64–234, 39 Stat. 534 (1916), and thus qualify for the exception to the FPA's licensing requirement. (Domtar actually acquired the licenses to the upstream facilities in 2001, well after the previous licensee, Georgia-Pacific Corporation, initiated the proceedings in this case. *See Ga.-Pac. Corp., Domtar Me. Corp.*, 97 F.E.R.C. ¶ 62,078, 64,114–15 (2001). For simplicity, we will refer to the petitioner as Domtar regardless of the time period under discussion.)

In 1995, Domtar started down what would prove to be a long and complex procedural path culminating in the proceedings now before us. The company petitioned FERC to declare that the two upstream facilities, though already licensed, actually fell outside FERC's jurisdiction because the downstream projects that they benefited were themselves exempt from the licensing requirement. FERC declined to do so, holding that the downstream projects' exemption had no effect on the jurisdictional status of the upstream dams. *See Ga.-Pac. Corp.*, 77 F.E.R.C. ¶ 62,189 (1996) ("Ruling 1"), *reh'g denied*, 78 F.E.R.C. ¶ 61,223 (1997) ("Ruling 2").

Although Domtar petitioned this court to review Rulings 1 and 2, we stayed those proceedings after Domtar filed a second petition with FERC. In that petition, Domtar asked the Commission to reverse its previous decisions and hold that the upstream facilities needed no licenses. Domtar based its request on new evidence purportedly showing that the upstream facilities did not enhance the power-generation capabilities of the downstream projects. According to Domtar, this meant that neither facility was part of any "project," defined by FPA section 3(11) as a "complete unit of improvement or development, [including] all . . . dams [and] reservoirs . . . the use and occupancy of which are *necessary or appropriate* in the maintenance and operation of such unit." 16 U.S.C. § 796(11) (emphasis added). Based on Domtar's new evidence, FERC agreed that the upstream facilities did not enhance downstream power generation and thus required no licenses. *See Ga.-Pac. Corp.*, 81 F.E.R.C. ¶ 62,222 (1997) ("Ruling 3").

The following month, several groups that had previously sought to intervene in the proceedings—including the U.S. Department of the Interior and the Passamaquoddy Tribe—petitioned FERC to rehear Ruling 3. In response, FERC asked Domtar for additional data regarding the upstream facilities, and after analyzing the data, FERC again reversed itself, concluding that the facilities in fact required licenses. *See Ga.-Pac. Corp.*, 91 F.E.R.C. ¶ 61,047 (2000) ("Ruling 4"), *reh'g denied*, 98 F.E.R.C. ¶ 61,312 (2002) ("Ruling 5"). Domtar then filed a second petition for review with this court, but simultaneously asked FERC to rehear two aspects of Ruling 5—its refusal to offer the company any guidance on how to operate the facilities so as to avoid the licensing requirement, and its decision to solicit other applicants to replace Domtar as the licensee. Responding to Domtar's request, FERC issued a final order, again declining to provide the requested advice and standing by its decision to solicit other license applicants, but ruling that it would give Domtar an incumbent's preference in any re-licensing proceedings. *See Domtar Me. Corp.*, 99 F.E.R.C. ¶ 61,276 (2002) ("Ruling 6").

Domtar then filed a third petition for review with this court, in which it listed Ruling 6 as the ruling under review. At the time, the company's second petition for review was still pending, but we subsequently dismissed that petition as premature, explaining that when Domtar filed the petition, the company was still pressing its case before the Commission. *See Domtar Me. Corp. v. FERC*, Nos. 97-1300, 02-1126, 02-1178, 2002 U.S. App. LEXIS 18,157 (D.C. Cir. Aug. 29, 2002) (unpublished order). We also consolidated Domtar's first and third petitions. *Id.* FERC subsequently filed a motion to dismiss the third petition, which we now address along with Domtar's first and third petitions. We also consider intervenor Passamaquoddy Tribe's argument that we should remand the case so that FERC can determine whether the upstream facilities occupy "reservations of the United States," and thus require a license under FPA section 23(b)(1).

## II.

In its motion to dismiss, FERC points out that Domtar's third petition for review seeks review only of Ruling 6—a ruling that was, according to FERC, nothing more than a denial of a rehearing request. It is true that "an order which merely denies rehearing of another order is not itself reviewable." *Microwave Communications, Inc. v. FCC*, 515 F.2d 385, 387 n.7 (D.C. Cir. 1974). It is also true that "a petition for review of an agency order must specify the order or part thereof to be reviewed," and that "[f]ailure to specify the correct order can result in dismissal of the petition." *Entravision Holdings, LLC v. FCC*, 202 F.3d 311, 312 (D.C. Cir. 2000) (internal quotation marks omitted). That said, "a party may . . . appeal from one order despite referring only to a different order in its petition . . . if the petitioner's intent can be fairly inferred from the petition or documents filed more or less contemporaneously with it." *Martin v. FERC*, 199 F.3d 1370, 1372 (D.C. Cir. 2000) (internal quotation marks omitted).

Under the circumstances of this case, we believe that Domtar's intent to seek review of Ruling 4, the underlying

aggrieving order, can be "fairly inferred." We did not dismiss Domtar's second petition for review, which listed Ruling 4, until several months after the company filed its third petition. Thus, at the time it filed that petition, Domtar already had a petition pending that sought review of Ruling 4. In light of this, Domtar's decision to list only Ruling 6 in its third petition is more reasonably viewed, both now and at the time it was filed, as evincing the company's effort to ensure that all of the Commission's orders would be reviewed, rather than as a sudden decision to reverse course and abandon any attempt to have this court review Ruling 4. To be sure, the wiser course of action would have been for Domtar to dismiss the second petition voluntarily when it filed the third, and then to list Ruling 4 in the third petition. We are nevertheless convinced that FERC could fairly infer not only that Domtar still wished to challenge Ruling 4 when it filed its third petition, but also that the company had simply made a mistake when it listed only Ruling 6 in that petition. Moreover, FERC does not claim that it suffered any prejudice because of Domtar's decision to list Ruling 6 instead of Ruling 4. It does contend that Domtar's decision reflected a strategic choice, rather than a mistake, but we think that assertion unconvincing: Domtar had nothing to gain—and much to lose—by pursuing the course it did. We will therefore deny FERC's motion to dismiss Domtar's third petition.

Turning to the merits of the petitions, we begin with Domtar's argument that Rulings 4, 5, and 6 were all beyond FERC's power to issue, and that we should therefore regard Ruling 3—the only one in which the company prevailed—as final. Domtar points out that only parties can petition FERC for rehearing, *see* 16 U.S.C. § 825l(a), and that when the would-be intervenors asked the Commission to rehear Ruling 3, they were not yet parties to the case. They were not yet parties because FERC did not grant their motions to intervene until Ruling 4, *see* 91 F.E.R.C. at 61,170 n.19, over two years after they petitioned for rehearing. Therefore, Domtar concludes, Ruling 3 became final when the thirty-day window to seek rehearing closed, and Rulings 4, 5, and 6—all of which stem from the would-be intervenors' petition for a rehearing

of Ruling 3—are invalid because the Commission did not issue them in response to a proper request for rehearing.

In response, FERC insists that the requests for rehearing were procedurally proper because in Ruling 4 it granted the motions to intervene retroactive to the date of Ruling 3, a date prior to the filing of the requests. *See Ga.-Pac. Corp.*, 98 F.E.R.C. at 62,339 n.40. According to the Commission, this is not the first time that it has granted intervention retroactively. In the first case in which it did so, the Commission justified the procedure on the ground that otherwise a party would have to move to intervene prior to an initial ruling by the Commission. *See Mohawk Paper Mills, Inc.*, 33 F.E.R.C. ¶ 61,291, 61,584 (1985). This is so because a party could almost never move to intervene, have the motion granted, and then petition for rehearing all within the thirty-day window established for the filing of rehearing petitions. *See id.*

Not only have we never approved FERC's practice of granting intervention retroactively, but the practice seems inconsistent with the statutory limitation that only a party can petition FERC for rehearing. Indeed, one could argue that Congress crafted that limitation for the very purpose of requiring parties to intervene before an initial Commission ruling, thus precluding them from waiting until FERC ruled and then raising new arguments that might, if brought forth initially, have saved the Commission and the parties from spending time and money on a second proceeding. Here, however, the would-be intervenors *did* move to intervene prior to Ruling 3—the Commission's initial ruling on Domtar's second petition; it was FERC's failure to grant intervention in Ruling 3 that later required the Commission to resort to the procedural gimmick of retroactive intervention. So even if Congress wanted to require parties to present arguments to FERC as early as possible, that objective was not subverted here. Moreover, Domtar does not claim that the retroactive grant deprived it of the ability to present any of its arguments to the Commission. Thus, while we are unprepared to say that a retroactive grant of intervention is always permissible, we conclude that in the circumstances of

this case, it was. Accordingly, we reject Domtar's assertion that Rulings 4, 5, and 6 are invalid.

Domtar next claims that its two upstream facilities are covered by the 1916 law that exempts the downstream projects from the licensing requirement, and that the upstream facilities are therefore also exempt. We are unpersuaded. The 1916 statute speaks in specific terms, authorizing only the operation of "the two dams" at Woodland and Grand Falls. 39 Stat. at 534. It mentions no other facilities. Given that the upstream dams existed in 1916, we expect that Congress would have referred to them had it wanted the law to cover them. Reinforcing this conclusion, the upstream facilities are ten and thirty-five miles, respectively, from the nearest downstream project, and it seems implausible that Congress, by using the word "dams," intended to encompass not only the two downstream dams but also other facilities so far away. "If the intent of Congress is clear, that is the end of the matter. . . ." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).

Domtar argues that even if the permit does not expressly cover the upstream facilities, FERC's decision to require licenses for those facilities violates FPA section 23(a), which provides in part that the Act "shall not be construed as affecting any permit . . . granted prior to June 10, 1920." 16 U.S.C. § 816. According to Domtar, if the two upstream facilities enhance the power-generating capability of the downstream projects, then requiring licenses for the upstream facilities would "affect" the projects' permit. It would do so, Domtar asserts, because the permit conferred the right to use all existing assets to generate power, and since those assets include the two upstream facilities, requiring licenses for those facilities would limit that right, thereby affecting the permit.

Because Domtar first advanced this section 23(a) argument in its reply brief, FERC has moved to strike the argument on the ground that it was raised too late. *See, e.g.*, *A.J. McNulty & Co. v. Sec'y of Labor*, 283 F.3d 328, 338 (D.C. Cir. 2002)

("[B]ecause this point appears for the first time in the company's reply brief, we will not consider it."). Domtar responds that the argument is just a variation on those that it has made from the outset. We disagree. Domtar claims in its response to FERC's motion to strike that it has "consistently referenced 'section 23'" of the FPA. But this claim is misleading because section 23(b), which Domtar *has* referred to throughout these proceedings, and section 23(a), which it has not, are codified in two separate sections of the U.S. Code—sections 817 and 816 of Title 16, respectively. This is not, in other words, a situation in which a party cites a particular statutory section, and then later cites a subsection of that section. Domtar now cites an entirely different section, one that we can find no citation to in the record. Even the table of authorities in the company's initial brief omits section 816, which corresponds to section 23(a), further belying Domtar's claim that it has relied on section 23(a) throughout. Moreover, while there is some nexus between the section 23(a) argument and the ones that Domtar did raise earlier, those other arguments do not, in our view, fairly raise the section 23(a) issue. Put simply, none of the other arguments required FERC to explain why its orders did not "affect" the authority that Congress conferred in the 1916 permit. Thus, FERC never had a chance to address the section 23(a) issue, either during its own proceedings or in its brief to this court. We will therefore not consider the argument now.

Next, Domtar claims that Rulings 1 and 2 constitute a departure from *Union Water Power Co.*, 68 F.E.R.C. ¶ 61,180 (1994), *reh'g denied*, 73 F.E.R.C. ¶ 61,296 (1995). According to Domtar, that case established a test for determining whether a facility falls within FERC's jurisdiction and therefore requires a license: is the facility's link to "a licensed project" strong enough to invoke FERC's jurisdiction? *Id.* at 61,888. In other words, Domtar says that *Union Water* held that the Commission would examine the "relationship between the facilities in question and the already-identified *jurisdictional* components of the hydropower project." *Id.* at 61,889 (emphasis added). Noting that its upstream facilities

are linked only to two downstream projects that FERC concedes require no licenses, Domtar argues that under *Union Water*, the upstream facilities also require no licenses because they are not linked to any "licensed project."

FERC responds that in *Lake Ontario Land Development and Beach Protection Ass'n v. Federal Power Commission*, 212 F.2d 227 (D.C. Cir. 1954), we affirmed the Commission's authority to license only some parts of a project. In that case, we held that FERC's predecessor, the Federal Power Commission, could require licenses for those parts of a project that were in the United States even though it clearly could not require other parts to be licensed because they were in Canada. *Lake Ontario*, Domtar replies, was different because there the parts that were in the United States (and hence within the agency's jurisdiction) generated power. Here, by contrast, the only facilities that might fall within FERC's jurisdiction—the upstream ones—generate no power. Although FERC insists that *Lake Ontario* "did not turn on what part of a project was jurisdictional," Respondent's Br. at 20, it points to nothing either in the opinion or in later cases to support that assertion. FERC also points out that *Lake Ontario* "required that any jurisdictional facilities be licensed . . . ." *Id.* That is true, but unhelpful because Domtar argues that its upstream facilities are simply not within FERC's jurisdiction. Moreover, *Lake Ontario*'s affirmation of FERC's licensing authority does not foreclose the possibility that FERC later, i.e., in *Union Water*, interpreted the FPA to mean that a non-generating facility needs no license if it is linked only to generating facilities that are themselves exempt from the licensing requirement.

As to *Union Water*, FERC asserted in Ruling 2 that the "licensed project" and "already-identified jurisdictional components" language from *Union Water* was "simply descri[bing]" the actual projects in that case. *Ga.-Pac. Corp.*, 78 F.E.R.C. at 61,955. That assertion, however, seems inconsistent with the actual structure of the ruling: The quoted language appears in the first two paragraphs of the ruling's discussion section; the third paragraph then begins with, "[t]urning to the facilities at hand . . . ." *Union Water*, 68

F.E.R.C. at 61,889. In other words, in the first two paragraphs FERC seems to have been speaking in general terms and laying out guiding principles of law before turning in the third paragraph to the facts of the case before it. The Commission's use of the indefinite phrase "a licensed project" instead of the more definite phrase "the licensed project" further undermines FERC's claim that it was talking about the specific facilities in the case rather than in general terms. Nevertheless, Domtar cites no case in which FERC held, as Domtar wants us to hold here, that the Commission lacked jurisdiction over a non-generating installation because the generating facilities to which the installation was connected were themselves exempt from the licensing requirement. Absent any such inconsistency between previous Commission rulings and FERC's orders in this case, we will not overturn FERC's interpretation of its own ruling. *See United Mun. Distribs. Group v. FERC*, 732 F.2d 202, 211–12 (D.C. Cir. 1984) ("[T]he Commission's decision . . . is not inconsistent with prior Commission precedent. We therefore reject [the] invitation to overturn the Commission's orders on that ground.").

Domtar next argues that FERC's orders are arbitrary and capricious because the Commission lacks a coherent test for deciding whether a facility requires a license. The company points out that FERC exercised jurisdiction over the two developments that comprise its West Branch facility even though those developments, when viewed in isolation, enhance downstream power generation by an average of only 0.5 and 1.8 percent, respectively. Domtar then cites two cases in which FERC declined to exercise jurisdiction over facilities that enhanced downstream generation by similar percentages. *See Me. Dep't of Conservation*, 95 F.E.R.C. ¶ 62,015 (2001) (0.6 to 0.9 percent); *Matagamon Lake Ass'n*, 94 F.E.R.C. ¶ 62,195 (2001) (1.3 to 2.1 percent). Domtar's comparison misses the mark, however, because in each of the other two cases—as here—there were several upstream facilities, and the figures that Domtar cites from those cases were aggregate enhancement levels. Domtar, in other words, seeks to compare the separate enhancement levels of its facilities to the combined enhancement levels of the facilities in the two

cited cases. The proper comparison is with the combined enhancement level in this case, and because that level (for West Branch and Forest City combined) ranges from 2.4 to 4.9 percent, well above the levels in the other cases, those cases provide no support for Domtar's charge of arbitrariness.

Domtar also relies on *Chippewa and Flambeau Improvement Co.*, 95 F.E.R.C. ¶ 61,017 (1998), *reh'g denied*, 95 F.E.R.C. ¶ 61,327 (1998), *aff'd*, 325 F.3d 353 (D.C. Cir. 2003). In that case, unlike here, FERC considered the impact of two upstream facilities separately even though the same entity owned both. The Commission replies that it did so because one of the two facilities enhanced downstream power generation by less than one tenth of one percent. In other words, the Commission employs two separate thresholds when determining jurisdiction: one for the collective impact of all upstream facilities owned by the same entity and a second for the impact of individual facilities. With the former, FERC declines jurisdiction over all of the facilities when their aggregate average impact falls below a threshold that appears from FERC's cases to lie somewhere between 2 and 2.5 percent. With the latter, FERC declines jurisdiction over an individual facility and excludes its effect on downstream generation from any aggregate calculations if its impact falls below some lower threshold, i.e., 0.1 percent. This latter threshold explains *Chippewa*. Applying this two-threshold framework here, FERC considered Domtar's upstream facilities together because they were owned by the same entity and neither fell below the 0.1 percent threshold. The Commission then exercised jurisdiction because the average aggregate impact of the two facilities is 3.4 percent, far above the 2-to-2.5 percent threshold. To be sure, FERC does not explicitly advance this framework—a framework that we believe is sufficiently reasonable and predictable that we may sustain it—but we think that it "may reasonably be discerned" both from the Commission's explanation of *Chippewa* and from its decisions in other cases. *See Jost v. Surface Transp. Bd.*, 194 F.3d 79, 85 (D.C. Cir. 1999) ("We may not supply a reasoned basis for the agency's decision that the agency itself has not given. We

will, however, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (quoting *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983)) (internal quotation marks omitted).

Attempting to bolster its arbitrary-and-capricious argument, Domtar notes that in *Union Water*, FERC declined jurisdiction over a facility that impounded 4.78 percent of the usable storage in a river's storage system. According to the company, this reveals FERC's arbitrariness here because its facilities—over which FERC did exercise jurisdiction—enhanced downstream generation by an average of 3.4 percent, and 4.78 is higher than 3.4. Domtar is comparing apples and oranges: 4.78 was not the percentage by which the facility in *Union Water* enhanced downstream power generation, but rather the percentage of the river's usable storage that the dam impounded. If Domtar wants to make a useful comparison, it can compare 4.78 to the usable-storage figure for its two upstream facilities, which FERC says is 72.26 percent. (FERC did not determine the generation-enhancing percentages in *Union Water*, so generation-enhancement figures for the two cases cannot be compared.)

Domtar also points to the Commission's decision in *Union Water* to assess the impact of several facilities individually, as in *Chippewa*, instead of aggregating their effects, as it did here. But the company failed to make this argument to FERC, and our review is limited by statute to those objections that FERC has had an opportunity to consider. *See* 16 U.S.C. § 825l(b). To be sure, the company did argue to FERC that its rulings are inconsistent because the Commission sometimes considers facilities in isolation and other times aggregates their effects. Yet it did not point to *Union Water* in making this argument, thus depriving the Commission of an opportunity to explain its own ruling. Having failed to mention *Union Water* before the Commission, Domtar may not use that case to support its argument now.

For its last argument, Domtar contends that Rulings 4 and 5 conflict with FPA section 23(b)(1), which makes it unlawful to operate a facility without a license "for the purpose of generating electric power." 16 U.S.C. § 817(1). Domtar asserts that the purpose of its upstream facilities is not power generation, but the advancement of flood control, recreational, and environmental objectives. According to Domtar, FERC refused to consider the purpose of its facilities when determining whether they had to be licensed, thereby effectively reading the "purpose" language out of the statute.

This argument is also waived. Domtar did not make its purpose argument in its first petition to FERC, nor did it contest either the statement in Ruling 1 that the purpose of the upstream facilities was held in 1980 to be power generation, *see* 77 F.E.R.C. at 64,351, or the statement in Ruling 2 that the upstream facilities were still being operated for that purpose, *see* 78 F.E.R.C. at 61,954. True, in response to the would-be intervenors' request for rehearing of Ruling 3, the company argued that "[s]ection 23(b)(1) provides for mandatory jurisdiction only if the reservoir is operated *for the purpose of developing electric power*—and the headwater benefits analyses demonstrate that the Reservoirs in this case are not operated for that purpose . . . ." But Domtar never expanded on that assertion. In particular, it failed to mention FERC's earlier statements that the purpose of the upstream facilities was power generation—which, again, it did not object to at the time. Because a party has "at least a modicum of responsibility for flagging the relevant issues which its documentary submissions present[ ]," *AT&T Corp. v. FCC*, 317 F.3d 227, 235 (D.C. Cir. 2003), Domtar had an obligation, especially in light of its earlier silence, to state clearly that it was either disavowing any prior concessions it might have made about the facilities' purpose or contending that new evidence showed that the purpose had changed. Its failure to do so left FERC with no reason to think that Domtar was advancing an argument about section 23(b)(1).

Domtar did make a detailed purpose argument during FERC's consideration of the company's second petition, an argument that FERC responded to in Ruling 5. *See* 98 F.E.R.C. at 62,335–36. But that argument addressed how the purpose of the upstream facilities informed the question of whether they were "necessary or appropriate" to the operation of the downstream projects, and hence a part of those projects under FPA section 3(11). At oral argument, agency counsel contended that making a section 3(11) purpose argument is insufficient to raise a section 23(b)(1) purpose argument. In Ruling 4, however, FERC itself stated that the two arguments are closely related. Responding to an assertion by one of the intervenors, the Commission wrote that "[w]ere we to find that the [upstream facilities] are not necessary or appropriate with regard to the downstream projects, this would equate to a finding that the reservoirs are not being maintained for the purpose of generating electricity, so that Section 23(b) would not apply." *Ga.-Pac. Corp.*, 91 F.E.R.C. at 61,172 n.25. We are thus somewhat skeptical of the Commission's claim that because Domtar only raised a section 3(11) purpose argument, FERC had no notice of the section 23(b)(1) purpose argument. That said, we do not think that a concession by FERC that two arguments are closely related (if not equivalent) allows a litigant to make one argument to the Commission and then the other on appeal. If Domtar wished to argue that FERC was ignoring the language of section 23(b)(1), it had an obligation to make that argument to the Commission. Having failed to do so, it may not ask us to entertain the argument now. *See* 16 U.S.C. § 825l(b).

## III.

This brings us finally to the Passamaquoddy Tribe's contention that we should remand the case so that FERC can decide whether Domtar's upstream facilities occupy "reservations of the United States." 16 U.S.C. §§ 797(e), 817(1). If they do, then FERC would have an additional basis for requiring that the facilities have licenses, *see id.* § 817(1), as well as several more requirements to satisfy before it could

issue a license, *see id.* §§ 797(e), 803(e). But because FERC has already determined that it has jurisdiction over the facilities, nothing would be gained by finding another basis for jurisdiction. As to the additional requirements, the Commission tells us (and Domtar agrees) that it can address them during re-licensing proceedings. Since Congress has not spoken directly to this issue, and since the Commission's position represents a reasonable interpretation of the Federal Power Act, we must defer to it. *See Chevron*, 467 U.S. at 842–43. Moreover, we have long given agencies broad discretion as to the manner in which they carry out their duties, including the timing of their own proceedings. *See Natural Res. Def. Council, Inc. v. SEC*, 606 F.2d 1031, 1056 (D.C. Cir. 1979) ("[T]he agency . . . alone is cognizant of the many demands on it, its limited resources, and the most effective structuring and timing of proceedings to resolve those competing demands. An agency is allowed to be master of its own house, lest effective agency decisionmaking not occur in any proceeding. . . ."). Indeed, at oral argument, counsel for the Tribe agreed that FERC's approach would make no substantive difference, saying that while there may be efficiency considerations, ultimately this is simply "a question of now or later." Under these circumstances, we decline the Tribe's invitation to remand the case for further proceedings.

## IV.

The petitions for review are denied.

*So ordered.*