# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 6, 2020        Decided March 27, 2020

No. 19-1030

SNOHOMISH COUNTY, WASHINGTON,
PETITIONER

v.

SURFACE TRANSPORTATION BOARD AND UNITED STATES OF
AMERICA,
RESPONDENTS

CITY OF WOODINVILLE, WASHINGTON AND KING COUNTY,
WASHINGTON,
INTERVENORS

Consolidated with 19-1136

On Petitions for Review of Orders
of the Surface Transportation Board

*Charles H. Montange* argued the cause and filed the briefs
for petitioner.

*Barbara A. Miller*, Attorney, Surface Transportation
Board, argued the cause for respondents. With her on the brief
were *Michael F. Murray*, Deputy Assistant Attorney General,
U.S. Department of Justice, *Robert B. Nicholson* and *Adam D.*

*Chandler*, Attorneys, *Craig M. Keats*, General Counsel, Surface Transportation Board, and *Theodore L. Hunt*, Associate General Counsel.

*W. Eric Pilsk*, *Charles A. Spitulnik*, and *Allison I. Fultz* were on the briefs for intervenor for respondent King County, Washington.

Before: MILLETT, PILLARD, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Concurring opinion filed by *Circuit Judge* MILLETT.

PILLARD, *Circuit Judge*: The Surface Transportation Board (the Board) often allows parties to acquire or operate railroad lines by submitting a streamlined "notice of exemption" in lieu of satisfying the Board's full certification requirements. Any exemption granted is "void *ab initio*" if the submitted notice contains "false or misleading information." 49 C.F.R. §§ 1150.32(c), 1150.42(c). Here, petitioner Snohomish County sought to revoke two exemptions the Board granted with respect to a freight rail easement over the County's property, alleging that both notices misrepresented the easement's ownership. The Board denied the County's petitions on the ground that only a court competent in property, contract, and bankruptcy law could determine whether the notices' representations were in fact false. Following the Board's denial, the County unsuccessfully sought reconsideration within the agency and twice petitioned this court for review. We conclude that we have jurisdiction over the County's second petition to review the Board's denial and hold that the Board's failure to consider whether the notices were independently misleading under the Board's own

precedent—even if not demonstrably false as a matter of state or federal law—was arbitrary and capricious.

## BACKGROUND

### A. Legal Framework

The Surface Transportation Board, the successor to the Interstate Commerce Commission, regulates the freight rail industry in accordance with the "[r]ail transportation policy" set forth in 49 U.S.C. § 10101, which requires the Board, *inter alia*, to "encourage honest and efficient management of railroads," *id.* § 10101(9). In addition to regulating railroad rates and finance, the Board "regulates the sale and transfer of rail lines under 49 U.S.C. § 10901, governing construction and operation of railroad lines, and 49 U.S.C. § 10902, governing short-line purchases by Class II and Class III rail carriers." *Ass'n of Am. R.R. v. Surface Transp. Bd.*, 161 F.3d 58, 60 (D.C. Cir. 1998). As relevant here, Class III rail carriers are the smallest carriers in the Board's classification system, defined as carriers "having annual carrier operating revenues of $20 million or less" after an adjustment provided by regulation. *See* 49 C.F.R. § 1201.1-1(a). The Board's authority over rail operations and acquisitions is exclusive and preemptive of state remedies. 49 U.S.C. § 10501(b). A party seeking to acquire or operate a railroad line may do so "only if the Board issues a certificate authorizing such activity." 49 U.S.C. §§ 10901(a), 10902(a); *see also Ass'n of Am. R.R.*, 161 F.3d at 60.

To receive the necessary acquisition or operation certificate, the party must submit an application that provides information about itself and its proposed use of the line, including operational, financial, environmental, and energy data. *See* 49 C.F.R. §§ 1150.1 *et seq.* (describing § 10901 application requirements). Upon receiving the application and providing time for public comment, the Board issues the

certificate, potentially with modifications or conditions, "unless the Board finds that such activities are inconsistent with the public convenience and necessity." 49 U.S.C. §§ 10901(c), 10902(c).

Congress has also encouraged the Board, "to the maximum extent consistent" with the statute, to "exempt a person, class of persons, or a transaction or service" from any or all of the governing statutory provisions insofar as compliance with those provisions "is not necessary to carry out the transportation policy" codified in 49 U.S.C. § 10101, and if either the "transaction or service is of limited scope" or the "application in whole or in part of the provision[s] is not needed to protect shippers from the abuse of market power." *Id.* § 10502(a)(1)-(2); *see also Kessler v. Surface Transp. Bd.*, 635 F.3d 1, 3 (D.C. Cir. 2011). That exemption authority "permits the [Board] to create expedited review processes" so that parties may "avoid sometimes cumbersome regulatory procedures when making small purchases." *Ass'n of Am. R.R.*, 161 F.3d at 60-61. The same section authorizes the Board to "revoke an exemption, to the extent it specifies," whenever it concludes that revocation is "necessary to carry out the transportation policy of section 10101." 49 U.S.C. § 10502(d).

The Board has accepted Congress' invitation to exempt certain classes of transactions from the full certification requirements of sections 10901 and 10902. The Board generally exempts "all acquisitions and operations under section 10901," including, as relevant here, "[a]cquisition[s] by a noncarrier of rail property that would be operated by a third party." 49 C.F.R. § 1150.31(a). And the Board exempts "acquisitions or operations by Class III rail carriers under section 10902," including, as relevant here, "[o]peration[s] by a Class III carrier of rail property acquired by a third party." *Id.* § 1150.41.

In parallel sets of regulations, the Board lays out the streamlined process for both exemptions. *See* 49 C.F.R. §§ 1150.31 *et seq.*, 1150.41 *et seq.* An applicant may qualify for an exemption simply by filing a "notice of exemption," *i.e.*, a "verified notice providing details about the transaction, and a brief caption summary." 49 C.F.R. §§ 1150.32, 1150.42. In the notice, the applicant must provide basic information, including the applicant's "full name and address," the "name, address, and telephone number" of the applicant's representative, a "statement that an agreement has been reached or details about when an agreement will be reached," the identity of the "operator of the property," and a "brief summary of the proposed transaction," including the "name and address of the railroad transferring the subject property," the "proposed time schedule for consummation of the transaction," the "mile-posts of the subject property," and the "total route miles being acquired." 49 C.F.R. § 1150.33(a)-(e); *see also id.* § 1150.43(a)-(e). Within sixteen days of the filing of the notice, the Board must publish notice of the proposed transaction in the Federal Register. *Id.* §§ 1150.32(b), 1150.42(b). In the absence of objection, the exemption becomes effective thirty days after the applicant files the notice. *Id.*

Crucially, and despite the streamlined nature of the exemption proceedings, both sets of regulations further caution that, if the applicant's "notice contains false or misleading information, the exemption is void *ab initio*." *Id.* §§ 1150.32(c), 1150.42(c). The regulations also cross-reference the Board's exemption-revocation authority, stating that "[p]etitions to revoke the exemption under 49 U.S.C. § 10502(d) may be filed at any time." *Id.* §§ 1150.34, 1150.44. Snohomish County filed two such petitions to revoke exemptions the Board granted with respect to an easement on the County's property, giving rise to this dispute.

**B. Factual and Procedural History**

Before the events that prompted the County's petitions, BNSF Railway owned both the land and fixtures composing the railroad line at issue. In December 2009, BNSF deeded to the Port of Seattle the track, as well as other property and physical assets, between milepost 23.8 in Woodinville, Washington and milepost 38.25 in Snohomish, Washington, retaining only a freight rail easement over this segment of line. The same day, BNSF deeded that freight rail easement to an entity called GNP RLY, Inc., whose Chief Financial Officer and 50% shareholder was Douglas Engle. Thereafter, the underlying property was sold once more when, in 2016, the Port of Seattle deeded to Snohomish County the physical assets of the line between milepost 26.38—the border of the County—and milepost 38.25, and deeded to the City of Woodinville the remainder of the segment, between milepost 23.8 and milepost 26.38. The controversy here stems from two transactions involving the easement, each implicating one of the class exemptions described above.

First, in November 2012, a new company called Eastside Community Rail (Eastside), a non-carrier also controlled by Engle, filed a notice of exemption under 49 C.F.R. § 1150.31, stating that it had agreed to "purchase the assets of GNP RLY, Inc. in a bankruptcy proceeding," including the freight rail operating easement over "a line of railroad formerly owned by BNSF[] and extending from approximately milepost 23.8 in Woodinville to approximately milepost 38.25 in Snohomish." J.A. 9. Eastside's notice explained that it would not itself operate over the easement; rather, Eastside had entered into an operating lease agreement with Ballard Terminal Railroad Company (Ballard), a carrier that had been operating the line since 2010. Under that agreement, Ballard would "continue to operate the Line in the same fashion that it was operating the

Line for GNP RLY." J.A. 10. To verify the information in the notice, Engle, as Managing Director of Eastside, submitted to the Board a sworn statement affirming that he "ha[d] read the foregoing Notice of Exemption and kn[ew] the facts asserted therein, and that the same are true as stated." J.A. 19. Upon receipt of the verified notice, the Board published notice of the transaction, incorporating its standard warning that "[i]f the verified notice contains false or misleading information, the exemption is void *ab initio*." 77 Fed. Reg. 70,206, 70,207 (Nov. 23, 2012). Eastside's exemption then became effective.

Second, in April 2013, Ballard, a Class III carrier, filed a notice of exemption under 49 C.F.R. § 1150.41, seeking Board authorization to operate over the freight rail easement through its lease with Eastside. This second notice explained that the "Line was the subject of a previous Notice of Acquisition and Operation . . . in which [Eastside] acquired a permanent freight operating easement on the Line pursuant to an Asset Purchase Agreement with the Bankruptcy Trustee for the bankrupt GNP RLY, Inc." J.A. 28. As with the previous exemption, the Board published the required notice, including the same warning that "[i]f the verified notice contains false or misleading information, the exemption is void *ab initio*." 78 Fed. Reg. 23,331, 23,331 (Apr. 18, 2013). Ballard's exemption became effective as well.

Both transactions went unchallenged for five years. Then, in July 2018, about two years after Snohomish County acquired by deed from the Port of Seattle most of the property underlying the freight rail easement, the County discovered possible irregularities in Eastside's original acquisition of the easement from GNP RLY. As permitted by section 10502, the County filed petitions to revoke both the Eastside exemption and—because it depended on Eastside's—the Ballard exemption.

In its Eastside petition, the County claimed that the "representations verified by Mr. Engle for [Eastside] and on which this Board relied were materially false and misleading." J.A. 45. In particular, the County argued that "GNP did *not* own sufficient property interests to operate a common carrier railroad at the time of the alleged acquisition by [Eastside]." J.A. 45. That was, the petition alleged, because "in January of 201[1]—a few days before GNP went into involuntary bankruptcy proceedings, and well before [Eastside] purported to acquire the property interests from GNP—Mr. Engle as Chief Financial Officer of GNP deeded GNP's freight railroad easement to Mr. Earl Engle (his father) and Ms. Joanne Engle (his wife)." J.A. 46. Due to that transfer, the petition claimed, "GNP did not have a freight rail easement to deed to [Eastside] after January 2011," J.A. 53, and Eastside therefore could not have acquired it when it purchased GNP's assets in the bankruptcy proceedings.

In addition to claiming that Engle's representations were outright false, the County argued that, "[a]t the very least, the verified notice of exemption was misleading by omission: Engle and [Eastside] should have advised this Board that Engle on behalf of GNP had already conveyed the freight rail easement to Engle's father Earl and wife Joanne, and that the easement was no longer in the bankrupt estate" that Eastside acquired. J.A. 55. As a result of Engle's misrepresentations, the County argued Eastside "in effect is a trespasser on the County's corridor," exposing the "County to unwarranted burdens and liabilities, and [] preventing sound management of the rail corridor in the public interest." J.A. 47. The County supported its petition with a declaration from Thomas Stowe, a Senior Review Appraiser for the Snohomish County Public Works Department, J.A. 65-76, and with twenty-one additional exhibits, including the deed from GNP to Engle's father and

wife, which was recorded in Snohomish County before GNP went into bankruptcy.

In the same petition, the County argued that Ballard's derivative exemption was also void: after all, if Eastside's "authorization to acquire the line is void *ab initio*," then Eastside "obviously had no property interest to lease" to Ballard to operate over. J.A. 57. The County reiterated this argument in its separate petition to revoke the Ballard lease, which incorporated the facts set forth in its Eastside petition and stated that Eastside "literally has never owned the line, because GNP did not own the line for purposes of conveying same to [Eastside] at any time relevant to [Eastside] or [Ballard]." J.A. 363. The County's Ballard petition, too, made clear that the County believed both notices were at least misleading, stating that the "failure to disclose material information can render a notice misleading by omission, and therefore void *ab initio*." J.A. 363 n.1 (internal quotation marks omitted).

Various interested parties submitted responses to the County's petitions. Most notably, in August 2018, Engle belatedly filed a reply to the Eastside petition. In his reply, Engle acknowledged for the first time that the "easement was transferred from GNP" to his father and wife in "early 2011," J.A. 386, 388, but claimed that the "easement was then transferred back to GNP in October 2011 *before* the end of the GNP bankruptcy proceedings[, t]hus making the freight easement transfer from GNP to [Eastside] completely legal," J.A. 386. Engle attached a copy of the purported re-transfer deed, which is lacking any signature by GNP, and faulted GNP for failing to record it. J.A. 389. Engle went on to claim that he and his father in fact retained at least partial ownership of the easement through October 2017, when they "sold the freight easement to NW Signal," a company who "ha[d] been

the signal maintainer for the line for the past 9-years." J.A. 389.

Also in August 2018, Ballard filed a response to the County's petition to revoke its exemption, disclaiming any knowledge of Engle's alleged actions. Ballard stated that it "believed in good-faith that [Eastside] owned the freight easement" and "was unaware that Mr. Engle may have successfully transferred ownership of the easement to his father and now ex-wife." J.A. 418. Ballard also noted its own difficulties dealing with Engle and pledged to operate over the line in accordance with whatever arrangement the Board concluded was appropriate. J.A. 418. Later the same month, the City of Woodinville filed a reply in support of Snohomish County, flagging several issues with Engle's reply. J.A. 419-25. For example, the City noted that Engle's claimed re-transfer was both "unrecorded and half-executed." J.A. 422. More problematic still, the City observed that Engle's reply was internally contradictory because, even as it purported to explain that Eastside validly acquired the freight easement through GNP's 2011 bankruptcy, it claimed that Engle and his father retained at least some interest in the easement as late as October 2017, when Engle claimed they sold it to NW Signal. *See* J.A. 423. Finally, Snohomish County filed its own reply to Engle, similarly stating that Engle's "pleading appears to admit that [Eastside] lacks title," because "Engle attache[d] a deed by which he and his father purport to convey a portion of the easement in King County to NW Signal in 2017." J.A. 427. The County further supported its reply with a second declaration from Stowe, its Senior Review Appraiser, that concluded the unrecorded deeds Engle included with his reply were invalid. J.A. 428, 433-38.

On December 13, 2018, the Board issued an Initial Order denying both of the County's petitions. *Eastside Cmty. Rail,*

*LLC—Acquisition & Operation Exemption—GNP Rly, Inc.,
and Ballard Terminal R.R. Co., L.L.C.—Lease Exemption—
Eastside Cmty. Rail, LLC*, FD 35692, 35730, 2018 WL
6579043 (STB served Dec. 13, 2018) (Initial Order). The
Board stated that the "petitions to revoke turn on whether, in
fact, GNP owned the Easement when [Eastside] filed its
verified notice for authority to acquire it and whether,
thereafter, [Eastside] owned the Easement when Ballard filed
its verified notice for authority to lease it." *Id.* at *6 (J.A. 482).
The Board explained that the "questions that must be resolved
to determine whether the notices of exemption were false or
misleading involve questions of ownership, which in turn
involve issues of state property and contract law and federal
bankruptcy law." *Id.* The Board then concluded that it could
not answer those ownership questions for itself; instead, the
questions "should be decided by appropriate courts." *Id.*
Therefore, the Board "den[ied] the County's petitions to
revoke . . . without prejudice to any party that wishes to file a
future petition to revoke once the questions of ownership have
been resolved." *Id.* (J.A. 483). Despite denying the petitions,
the Board acknowledged that "several of the actions described
in this record are troubling," flagging the "actions of Engle"—
notably, his claims to have transferred and retransferred the
easement without seeking Board authorization—that
"demonstrate a disregard for the Board's regulatory process."
*Id.* at *7 (J.A. 483). The Board also reaffirmed that "agencies
have inherent authority to protect the integrity of the regulatory
processes that they are charged with administering, and to
prevent or remedy a misuse of those processes." *Id.*

In February 2019, following the partial government
shutdown between December 22, 2018, and January 25, 2019,
the County took two actions to seek review of the Board's
Initial Order. First, on February 4, 2019, the County petitioned
the Board to reconsider its Initial Order. In its reconsideration

petition, the County argued that it had adequately shown that Eastside did not own the easement, and that the Board's contrary decision reflected "material error[s]" because the Board's exclusive rail authority preempts the ability of any state court to resolve the dispute. J.A. 487; *see also* 49 C.F.R. § 1115.3(b) (permitting a petition for reconsideration on the ground of "material error"). Then, three days later, the County filed a petition for review in this court (No. 19-1030). The Board moved to dismiss the petition for review, arguing that the County's pending petition for Board reconsideration rendered the Initial Order non-final. We held the petition in abeyance pending resolution of the County's reconsideration petition. Three months later, the Board denied reconsideration in a decision served May 17, 2019, largely reiterating the grounds given in its Initial Order. *See Eastside Cmty. Rail, LLC—Acquisition & Operation Exemption—GNP Rly, Inc., and Ballard Terminal R.R. Co., L.L.C.—Lease Exemption— Eastside Cmty. Rail, LLC*, FD 35692, 35730, 2019 WL 2158345 (STB served May 17, 2019) (Reconsideration Order). Thereafter, on June 21, 2019, the County timely filed a second petition seeking our review (No. 19-1136), referring only to the Board's Reconsideration Order. A week later, on our own motion, we consolidated the two petitions.

## DISCUSSION

### A. Jurisdiction to Review the Initial Order

Before we may reach the merits, we must determine whether we have jurisdiction to review the Board's Initial Order pursuant to either of the County's petitions for review. We examine petitions for review of orders of the Surface Transportation Board under the Hobbs Act, *see* 28 U.S.C. §§ 2321(a), 2342(5), which allows "[a]ny party aggrieved by [a] final order" to, "within 60 days after its entry, file a petition

to review the order in the court of appeals wherein venue lies," *id.* § 2344. We consider our jurisdiction over each petition in turn.

### 1. First Petition (No. 19-1030)

Snohomish County first petitioned for review of the Board's Initial Order on February 7, 2019, three days after filing for reconsideration within the agency. The Board moved to dismiss that first petition because the County's petition for reconsideration was pending before the Board. We held the petition in abeyance until the Board denied reconsideration and then consolidated the first petition with the new petition the County filed following entry of the Reconsideration Order.

We now hold that the first petition for review was incurably premature. Parties are not required to file petitions for reconsideration, but they may not "simultaneously move for reconsideration before the agency and petition this court for review." *TeleSTAR, Inc. v. FCC*, 888 F.2d 132, 133 (D.C. Cir. 1989) (per curiam); *see generally ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 285 (1987). Moreover, "when a petition for review is filed before the challenged action is final and thus ripe for review, subsequent action by the agency on a motion for reconsideration does not ripen the [earlier-filed] petition for review or secure appellate jurisdiction." *TeleSTAR*, 888 F.2d at 134. Rather, in order to "cure the defect, the challenging party must file a new notice of appeal or petition for review from the now-final agency order." *Id.*; *see also Clifton Power Corp. v. FERC*, 294 F.3d 108, 110 (D.C. Cir. 2002). Because the County's filing of a petition for reconsideration on February 4 rendered the Board's Initial Order non-final, its first petition was incurably premature and must be dismissed.

The County does not dispute any of the above reasoning. Instead, it suggests that its own petition for the Board's

reconsideration was untimely under the Board's regulations, and so could not affect the finality of the Initial Order. Snohomish Br. 8-9.  The Board's regulations provide that a petition for reconsideration "must be filed within 20 days after the service of the [Board] action or within any further period (not to exceed 20 days) as the Board may authorize." 49 C.F.R. § 1115.3(e).  During the time period in question, the Board altered its procedural deadlines due to the partial government shutdown, providing notice that "any material due to be submitted to the Board during the partial Federal government shutdown period . . . will now be due no later than February 4, 2019."  Filings Submitted or Due To Be Submitted During the Partial Federal Government Shutdown, 84 Fed. Reg. 1264, 1264 (Feb. 1, 2019).  Here, the County took advantage of the Board's extension and filed its petition for reconsideration on February 4, 2019—53 days after it received service of the Board's Initial Order.  The County now suggests that the Board lacked authority to change its procedural deadlines to account for this unusual circumstance.  But an agency generally has flexibility to adjust procedural rules set by regulation, *see, e.g.*, *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970), and the Board's general extension of deadlines in response to the shutdown contravened no statutory authority, *see* 49 U.S.C. § 1322(c) (permitting the Board to grant reconsideration "at any time").  We therefore conclude that the County's petition for reconsideration was timely, that this timely petition for reconsideration rendered the Initial Order non-final under the Hobbs Act, and that the County's first petition must be dismissed as incurably premature.

## 2.  Second Petition (No. 19-1136)

Snohomish County timely petitioned for review a second time on June 21, 2019, after the Board denied reconsideration on May 17, 2019.  That petition appears to seek review only of

the Board's Reconsideration Order, raising a separate jurisdictional question whether it supports our review of the Initial Order. A petition for review must "specify the order or part thereof to be reviewed." FED. R. APP. P. 15(a)(2)(C). An inaccurate specification in this context could have particularly severe consequences, because the County's petition for reconsideration was premised on a claim of "material error." J.A. 487. The Supreme Court has held that, "where a party petitions an agency for reconsideration on the ground of 'material error,' *i.e.*, on the same record that was before the agency when it rendered its original decision, an order which merely denies rehearing of the prior order is not itself reviewable." *Bhd. of Locomotive Eng'rs*, 482 U.S. at 280 (alterations and internal quotation marks omitted).

This court has repeatedly echoed that conclusion. For example, in *Village of Barrington v. Surface Transportation Board*, we observed that the Board had "denied rehearing of its 2008 decision, and it made no alteration in that underlying order[, so] there is nothing more we can say about Barrington's claims of material error." 758 F.3d 326, 328 (D.C. Cir. 2014); *see also Entravision Holdings, LLC v. FCC*, 202 F.3d 311, 315 (D.C. Cir. 2000); *Schoenbohm v. FCC*, 204 F.3d 243, 250 (D.C. Cir. 2000). Here, the second petition for review stated that "Snohomish County hereby petitions the Court of Appeals for review of the Decision of the Surface Transportation Board . . . served May 17, 2019," and linked to and attached only the Board's May 17 Reconsideration Order. Snohomish Cty. Pet. for Review at 1, No. 19-1136 (D.C. Cir. June 21, 2019). To the extent the second petition seeks review of the Board's Reconsideration Order, we must therefore dismiss the petition.

Nonetheless, we conclude that the second petition for review also manages to invoke our jurisdiction over the Initial

Order. We have made clear that our examination of compliance with Rule 15(a) is not formalistic. A "mistaken or inexact specification of the order to be reviewed" is "not fatal" if "[i] the petitioner's intent to seek review of a specific order can be fairly inferred from the petition for review or from other contemporaneous filings, and [ii] the respondent is not misled by the mistake." *Entravision Holdings*, 202 F.3d at 313. We conclude both factors support review here.

First, to determine whether the intent to seek review of a specific order may be "fairly inferred," this court generally looks to "contemporaneous filings," such as a docketing statement or statement of issues. *Id.* In *American Rivers v. FERC*, for example, we reviewed an order not explicitly identified in the petition because an intent to seek its review could be fairly inferred by looking to the motion to consolidate petitions, the docketing statement, the statement of issues, and the attached decisions. 895 F.3d 32, 44 (D.C. Cir. 2018); *see also Martin v. FERC*, 199 F.3d 1370, 1371-73 (D.C. Cir. 2000) (same, looking to a contemporaneously filed motion to stay, and later-filed docketing statement and certificate of rulings under review); *Damsky v. FCC*, 199 F.3d 527, 532-34 (D.C. Cir. 2000) (same, looking to references in a contemporaneously filed notice of appeal and concise statement of reasons). The difficulty is that some of the sources of intent to seek review that have informed our decisions in other cases are absent here because we chose to hold the County's first petition in abeyance, rather than dismiss it as incurably premature, and pretermitted further filings by *sua sponte* consolidating the two petitions a week after the County filed its second petition.

In these circumstances, we think it proper to consider the contemporaneous filings accompanying the then-still-pending first petition for review. Indeed, these facts resemble those in *Domtar Maine Corporation v. FERC*, where an earlier petition

sought review of an agency ruling, Ruling 4, and a later petition listed only another ruling, Ruling 6. 347 F.3d 304, 308 (D.C. Cir. 2003). There, we noted that "[w]e did not dismiss Domtar's [earlier] petition for review, which listed Ruling 4, until several months after the company filed its [later] petition," so, "at the time it filed that petition, Domtar already had a petition pending that sought review of Ruling 4." *Id.* As a result, we concluded that "Domtar's decision to list only Ruling 6 in its [later] petition is more reasonably viewed, both now and at the time it was filed, as evincing the company's effort to ensure that all of the Commission's orders would be reviewed, rather than as a sudden decision to reverse course and abandon any attempt to have this court review Ruling 4." *Id.*

So too here. The County did not expressly list or attach the Initial Order to its second petition but made clear in its first petition that it sought review of the Board's Initial Order. The County's briefing in response to the Board's motion to dismiss the first petition further confirms that intent. The County there observed that, if its petition for reconsideration rendered the Initial Order non-final, it could "file a new petition for review to the extent necessary upon agency action in response to the February 4 petition for administrative reconsideration." Snohomish Cty. Resp. in Opp'n to Mot. to Dismiss at 3-4, No. 19-1030 (D.C. Cir. Feb. 26, 2019). And the County also explained that it filed the first petition only because it was unsure of the shutdown's effect on the various Board and Hobbs Act deadlines. *Id.* at 4-5. As the County put it, "the County wishe[d] to be cautious rather than sorry, and should not suffer a penalty on that account." *Id.* at 8. Just as in *Domtar*, we are here "convinced that [the Board] could fairly infer not only" that the County wished to challenge the Board's Initial Order in its second petition, but also that the County "had simply made a mistake when it listed only [the Reconsideration Order] in that petition." 347 F.3d at 308.

As for the second factor bearing on our assessment of the scope of a notice of appeal under *Entravision*, at no point has the Board suggested that it has been misled by the County's mistake. Indeed, in its reply to the County's opposition to its motion to dismiss the first petition, the Board recognized that the County would likely seek judicial review of the Initial Order following a denial of its petition for reconsideration, assuring the court that "Snohomish will not be deprived of the opportunity to obtain judicial review if the Board should deny the administrative petition for reconsideration." Board Reply in Support of Mot. to Dismiss at 4-5, No. 19-1030 (D.C. Cir. Mar. 5, 2019). In its brief before this court, the Board does not contend that it has been misled. And, at oral argument, the Board conceded that its jurisdictional challenge focused only on the first part of *Entravision*, regarding the County's intent. *See* Oral Arg. Rec. 25:19-25:36. Given the County's efforts over several months to gain review of the Initial Order, it is difficult to see how the Board could have argued otherwise.

Because both aspects of the *Entravision* inquiry support our review, we conclude that we have jurisdiction to reach the merits of the County's challenge to the Initial Order via the second petition for review.

## B.  The County's Arbitrary-and-Capricious Challenge

On the merits, we review the Board's denial of the County's petition under the Administrative Procedure Act, examining whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Mfrs. Ry. v. Surface Transp. Bd.*, 676 F.3d 1094, 1096 (D.C. Cir. 2012); *Riffin v. Surface Transp. Bd.*, 592 F.3d 195, 197 (D.C. Cir. 2010). The "requirement that agency action not be arbitrary and capricious includes a requirement that the agency

adequately explain its result." *Jost v. Surface Transp. Bd.*, 194 F.3d 79, 85 (D.C. Cir. 1999) (quoting *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995)). This court "may not supply a reasoned basis for the agency's decision that the agency itself has not given." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). Rather, the Board "must articulate the reasoning behind its decision with sufficient clarity to enable petitioners and this court to understand the basis for its decision." *Id.* at 88. Here, we conclude that the Board's failure to consider whether the notices of exemption were misleading, even if not demonstrably false as a matter of state or federal law, was arbitrary and capricious.

Recall that, under the Board's regulations, a notice of exemption is void *ab initio* if it "contains false *or* misleading information." 49 C.F.R. § 1150.32(c) (emphasis added). In its petitions to revoke, the County made clear that it was arguing both that the notices were false and, at minimum, misleading. For example, in its petition to revoke the Eastside exemption, the County argued that, "[a]t the very least the verified notice of exemption was misleading by omission: Engle and [Eastside] should have advised this Board that Engle on behalf of GNP had already conveyed the freight rail easement to Engle's father Earl and wife Joanne, and that the easement was no longer in the bankrupt estate." J.A. 55; *see also* J.A. 62 (reiterating that "at the very least [Eastside] misrepresented by omission the facts on ownership"). And in its petition to revoke the Ballard exemption, the County again argued that "failure to disclose material information can render a notice misleading by omission, and therefore void *ab initio*." J.A. 363 n.1 (internal quotation marks omitted). The Board itself was aware that the County was raising both challenges, observing in its Initial Order that the County's petitions claimed the notices contained

both "false *and* misleading information."  Initial Order at \*6 (J.A. 481) (emphasis added).

Nonetheless, the Board's Initial Order collapsed the two inquiries into one, limited to falsity.  The Board provided one paragraph of meaningful analysis, beginning with the bare assertion that "[i]t is clear from these facts that the questions that must be resolved to determine whether the notices of exemption were false or misleading involve questions of ownership, which in turn involve issues of state property and contract law and federal bankruptcy law."  *Id.* (J.A. 482).  Operating from that premise, the Board ultimately concluded that it would "deny the County's petitions to revoke because they are based on claims concerning [Eastside's] property interests in the Line that should be addressed by an appropriate court," *id.* at \*1 (J.A. 476), and that "[w]ithout resolution of the ownership issues, the Board cannot determine whether the verified notices contained false or misleading information," *id.* at \*6 (J.A. 483).

We need not decide whether the Board permissibly declined to address the County's arguments about the falsity of Engle's filings, *but see infra* Concurring Op. at 2-6, because the Board's reasons do not in any event support its denial of the separate claim that the notices of exemption were misleading.  The record before the Board contained ample evidence of potential misleadingness, notably the omissions and inconsistencies in Engle's account that the County and others flagged.  For example, Engle's verified notice for the Eastside acquisition stated that Eastside had purchased "all assets, operating and lease rights of GNP RLY," including a "line of railroad formerly owned by BNSF," J.A. 9, all the while omitting the publicly recorded transfer (and the purported but unrecorded re-transfer) of the easement between Engle and his family that Engle now claims occurred.  In addition, Engle's

reply to the Eastside petition appears to be internally inconsistent, stating both that Engle and his family relinquished ownership of the easement by October 2011 and that they retained enough of an interest in the easement to sell it to NW Signal in 2017. Even the Board's Initial Order recognized that the "actions of Engle" were "troubling," "concerning," and "demonstrate[d] a disregard for the Board's regulatory process." *Id.* at *7 (J.A. 483). Yet the Order failed to explain how judicial resolution of the easement's ownership would help the Board determine whether the Board itself had been misled by Engle's representations.

Indeed, the Board failed to say anything at all about the County's claim of misleadingness. Existing Board precedent makes clear that misleadingness is an independent basis upon which to void a notice of exemption. The Board has recognized that the "[f]ailure to disclose potential issues regarding ownership of the issue line in a notice could be found to be materially misleading by omission." *Black Hills Transp. Inc. d/b/a/ Deadwood, Black Hills & Western R.R.—Modified Rail Certificate*, FD 34924, 2010 WL 302027, at *3 (STB served Jan. 27, 2010). Similarly, the Board has held that a party's "failure to disclose [a] condemnation action in its notice of exemption renders the notice's assertions regarding [] ownership of the property materially misleading by omission, rendering the notice void *ab initio*." *U.S. Rail Corp.—Lease & Operation Exemption—Shannon G., LLC*, FD 35042, 2008 WL 4534375, at *3 (STB served Oct. 8, 2008). The County cited both of those cases in its petitions, and the Board's Initial Order acknowledged that ownership of the easement was a material fact. Initial Order at * 6 (J.A. 482). Yet, despite being presented with the relevant precedent and Engle's apparently material omissions, the Board's Initial Order provided no explanation of its denial with respect to misleadingness. An "agency's failure to come to grips with conflicting precedent"

in this manner "constitutes an inexcusable departure from the essential requirement of reasoned decision making." *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1120 (D.C. Cir. 2010) (internal quotation marks omitted).

The Board might or might not ultimately determine that it has not been misled by Engle's maneuvering. We do not answer that question here. But because the Board has not "articulate[d] the reasoning behind its decision with sufficient clarity to enable petitioners and this court to understand the basis for its decision," *Jost*, 194 F.3d at 88, we conclude its denial of the County's petitions was arbitrary and capricious.

\* \* \*

We dismiss the County's first petition for review as incurably premature and dismiss the County's second petition with respect to its material-error challenge to the Board's Reconsideration Order. We have jurisdiction to review the Board's Initial Order pursuant to the County's second petition and conclude that the Board's denial of the petitions to revoke was arbitrary and capricious for failing to address the claim that the notices, whether or not ultimately false, misleadingly omitted material information. Therefore, we grant the second petition for review insofar as it challenges the Board's Initial Order, vacate that order, and remand the case to the Board for further proceedings consistent with this opinion.

*So ordered.*

MILLETT, *Circuit Judge*, concurring:

I join the court's opinion in full. I write separately, in light of our remand, to identify yet another troubling aspect of the Board's decision: Its insistence that only state courts, or perhaps a bankruptcy court, can decide whether filings submitted to the Board were "false" within the meaning of the Board's own regulation. *See* 49 C.F.R. §§ 1150.32(c), 1150.42 ("If the notice contains false or misleading information, the exemption is void *ab initio*."). The Board's refusal to interpret and apply its own regulation failed to grapple with its past decisions and the substantial practical obstacles to its current approach. Worse still, it leaves parties like the County caught in a Catch-22, trapped between the Board's preemption precedent and the Board's inertia.

The court quite correctly holds that the Board erred in bypassing the question of whether Douglas Engle's expedited exemption application was misleading. The Board itself determined that (i) "several of the actions described in this record are troubling"; (ii) Engle had told the Board just one month before filing the Eastside notice of exemption that the easement was owned by yet a different entity (apparently unknown even to the County)—Telegraph Hill Investments; (iii) "there were several conveyances of the Easement for which parties did not seek or obtain the needed Board authority," as required by statute, 49 U.S.C. §§ 10901, 10902; and (iv) "even when viewed in the best possible light, [Engle's actions] demonstrate[d] a disregard for the Board's regulatory process." *Eastside Community Rail, LLC – Acquisition & Operation Exemption – GNP RLY, Inc., and Ballard Terminal R.R. Co., – Lease Exemption – Eastside Community Rail, LLC*, FD 35692, 35730, 2018 WL 6579043, at *7 & n.11 (STB served Dec. 13, 2018) ("Initial Order") (J.A. 483). As the court's opinion explains, the Board cannot cast aside those extensive findings about disconcerting and far-from-forthright

filings by Engle without offering some reasoned explanation as to why they were not, at a minimum, misleading.

But the gaps in the Board's reasoning do not stop there. The Board also erred in washing its hands of the decision whether Engle's filings with the Board were false and, in particular, whether Eastside actually owns the railway line easement over which it is asserting operational control. Recall that Eastside filed a notice of exemption with the Board asserting that it would "purchase, inter alia, all of the GNP RLY assets and operating agreements pertaining to the Line[.]" J.A. 10. At the time of the notice, GNP RLY was in bankruptcy proceedings. But Engle, who filed Eastside's notice, neglected to mention that, in his capacity as GNP RLY's Chief Financial Officer, he had already deeded the easement to his then-wife and father. So GNP RLY seemingly had no easement to deed to Eastside or to anyone else.

When confronted with the County's evidence of that transfer, Engle offered a shifting and convoluted history of the easement. First, Engle asserted that the easement was transferred *back* to GNP RLY in October 2011 just 18 days before the bankruptcy settlement. In support of that assertion, all Engle could muster was an unrecorded deed and a half-executed sales agreement that was signed by his father and then-wife, but not signed by Engle or any GNP RLY official. Nor did Engle provide any evidence indicating that he had informed the bankruptcy trustee about, or that the bankruptcy trustee had approved of, that purported eve-of-settlement transaction.

That was not Engle's only version of events. Engle claimed secondly that his ex-wife transferred the easement to him as part of their 2015 divorce, and that he and his father had transferred their interests in the easement to Northwest Signal and Maintenance in October 2017.

Third, Engle had previously given the Board yet another rendition of events, advising that Telegraph Hill Investments held the easement. Initial Order, 2018 WL 6579043, at *7 n.11 (J.A. 483).

Rather than address whether Engle's filings in this case met its regulatory definition of a "false" filing, the Board punted. It ruled that "disputes concerning property and contract law should be decided by appropriate courts." Initial Order, 2018 WL 6579043, at *6 (J.A. 482). The Board also broadly asserted that "whether the parties have regulatory authority to acquire or operate over a certain segment of track is different from the question of whether that party (or parties) have the necessary property interest or contractual right to exercise that authority." Initial Order, 2018 WL 6579043, at *6 (J.A. 483). The Board then added that only a long-since-closed bankruptcy proceeding could decide the nature of the interest, if any, that Eastside obtained in the GNP RLY bankruptcy proceeding. The Board so ruled without acknowledging that the bankruptcy case had been closed over five years earlier and that the County was never a creditor or party to the proceeding.

Maybe such diffidence would be understandable if the Board were declining to act in the first instance on a certificate or notice of exemption. But not so here, where the Board has already stepped in and specifically authorized Eastside's operation of the railway line. Under those circumstances, the Board's inaction perpetuates the very railway operations that, if the County is right, Board law declares void from the get-go.

The Board's decisional paralysis failed the Administrative Procedure Act's requirements that agency decisionmaking both be reasoned and forthrightly address any prior contradictory positions.

Specifically, the Board consigned the County to state court to resolve the contract and property questions embedded in the County's plausible allegations of falsity. Initial Order, 2018 WL 6579043, at *6 ("[T]he determination of whether the parties have the necessary right to exercise Board authority is a question for a court with expertise in state contract and property law, and federal bankruptcy law.") (J.A. 483). But previously the Board has been explicit that when—as here—a railroad is already operating over property, the Board's "broad and exclusive jurisdiction over railroad operations and activities prevents application of state law [property] claims that would take rail property for another, conflicting use * * * that would interfere with rail use, present or future." *14500 Ltd. LLC – Petition for Declaratory Order*, FD 35788, 2014 WL 2608812, at *4 (STB served June 5, 2014) (preempting adverse-possession claim under state property law); *see Jie Ao & Xin Zhou – Petition for Declaratory Order*, FD 35539, 2012 WL 2047726, at *6–7 (STB served June 6, 2012) (same); *see also Pinelawn Cemetery – Petition for Declaratory Order*, FD 35468, 2015 WL 1813674, at *9 (STB served April 21, 2015) (attempt to evict a railroad based on state law was preempted).

There is the rub. If Board preemption decisions prevent state courts from adjudicating contract or property law challenges to operating railway lines, then the Board's own precedent cuts off the very relief from state courts that it ordered the County to seek.

The risk that the County's claim will be left betwixt and between is very real. In *Wedemeyer v. CSX Transportation*, the Seventh Circuit held that a state-law quiet title action was preempted because the plaintiffs sought "to eject CSX from land with active, ongoing rail operations[.]" 850 F.3d 889, 898 (7th Cir. 2017); *see also id.* at 893–894. Likewise, in *B & S Holdings, LLC v. BNSF Railway Co.*, the court ruled that a state-law adverse possession claim was completely preempted

"because not only would it interfere with railroad operations, but would divest the railroad of the very property with which it conducts its operations." 889 F. Supp. 2d 1252, 1258 (E.D. Wash. 2012). The County's challenge to Eastside's title would seem similarly to pull the property legs out from under an existing rail line.[1]

At best, the Board belatedly winked at the precedential obstacles to its decision, noting in its reconsideration decision that the courts to which it dispatched the County may not adjudicate the dispute because they "are preempted from providing the ultimate relief the County seeks (*i.e.*, ejectment)[.]" *Eastside Community Rail, LLC – Acquisition & Operation Exemption – GNP RLY, Inc., and Ballard Terminal R.R. Co., – Lease Exemption – Eastside Community Rail, LLC*, FD 35692, 35730, 2019 WL 2158345, at *4 (STB served May 17, 2019) ("Reconsideration Order") (J.A. 506). That is a sticky wicket.

But rather than grapple with its decisional dissonance, the Board shrugged off the County's objections that a "lack of standing or barriers to bringing a trespass action" meant that the state court would not decide the dispute. Reconsideration Order at *4 n.6. Such "impediments to a particular litigation," the Board declared, do not "affect the conclusion that the Board is not the proper forum" to address the County's effort to enforce the Board's own regulation. *Id*.

---

[1] The County assures this court that the line would not be removed from the federal rail network. *See* County Br. 44. The problem for the Board is that the scope of federal preemption turns on the objective legal consequences of a transfer in ownership, not the County's subjective intent, no matter how well meaning. *Cf. Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1905 (2019) (stating, in the context of field preemption of state law, that the focus is on "*what* the State did, not *why* it did it"). In any event, it is not clear that ownership of the easement would revert to the County.

That is no reason at all. In fact, it is worse than unreasoned. The Board effectively confesses that its solution appears unworkable. And then it plants its head right in the sand.

Making a bad situation worse, the Board told the County that yet another court—the GNP RLY bankruptcy court—would need to decide what property rights were transferred in that bankruptcy proceeding. While that might make sense if the bankruptcy proceeding were still pending, the bankruptcy case to which the Board referred the County ended seven years ago. *See* Order, *In re: GNP RLY, Inc.*, No. 11-40829-BDL, Docket No. 303 (Bankr. W.D. Wash. March 14, 2013). The Board left entirely unexplained how or why a closed bankruptcy case could provide a forum for adjudicating the County's claim. Not to mention that the County was not even a party to that earlier proceeding and, as such, has no apparent legal basis to seek the case's reopening. On top of all that, even if the bankruptcy case could be and were reopened, the Board did not even pause to ask whether GNP RLY continues to exist as an entity capable of assuming ownership over the easement.

Reasoned decisionmaking under the Administrative Procedure Act requires more than just wishing serious problems away.

Of course, it may be that the Board's disposition of the claim that Engle's filings were misleading will obviate any need to probe the falsity question. But whatever the Board does on remand, it surely cannot create a situation in which no one—neither the Board nor the courts—can decide substantial claims like those raised by the County under the Board's own regulation. At least not without sound reasoning to back up its decision.